### WALTER H. BUCK *vs.* MARCIA E. BRADY.

*Action for Injury from Bite of Dog—Liability of Owner of Dog Suspected of Hydrophobia—Care in Custody— Evidence—Proof of Hydrophobia.*

Plaintiff was bitten by defendant's dog which was supposed to be mad, and brought this action to recover damages therefor, alleging negligence on the part of the defendant in that he set the dog at liberty after having reason to suspect that it was suffering from rabies. At the trial evidence is admissible showing that in a conversation with the plaintiff the defendant had expressed his regret at the occurrence and said that his servant did not want him to turn the dog out, because he thought it was mad, and that the defendant himself thought so after the injury. This statement was a declaration against interest, since it tended to show knowledge on the defendant's part of the condition of the dog.

In such action, evidence that the plaintiff feared hydrophobia as a result of having been bitten, and suffered mental anguish, is admissible.

Evidence is admissible to show that defendant's servant in charge of the dog noticed its strange behavior, suspected that it was mad, and communicated his fears to the defendant.

Under the circumstances of this case, knowledge by the servant, the custodian of the suspected dog, of its diseased condition is to be imputed to the master.

The fact that a dog had hydrophobia may be shown by evidence of the results of an examination of the dog's head at a Pasteur Institute, together with entries in record books, although different parts of the examination were made by different, persons, and the opinion of one of the witnesses, that the dog had hydrophobia, was founded in part on the history of the dog.

When the owner of a dog has reason to suspect that it may be mad it is his duty to use every precaution to prevent the animal from inflicting injury upon others. In this case the question whether the defendant did use due care in the custody of his dog, after being informed of its unusual behavior, was properly left to the finding of the jury.

*Decided June 1st, 1909.*

Appeal from the Circuit Court for Baltimore County (VAN BIBBER, J.), where there was a verdict for the plaintiff for $1,000.

The cause was argued before BOYD, C. J., BRISCOE, SCHMUCKER, BURKE, THOMAS, WORTHINGTON and HENRY, JJ.

*C. Baker Clotworthy* (with whom was *J. Southgate Lemmon* on the brief), for the appellant.

*Z. Howard Isaac* (with whom was *W. Gill Smith* on the brief), for the appellee.

WORTHINGTON, J., delivered the opinion of the Court.

This action was brought by the appellee against the appellant to recover damages for injuries sustained by the plaintiff from the bite of a dog belonging to defendant.

The gravamen of the action is negligence on the part of the defendant in setting the dog at large, after being warned not to do so, and when he had good reason to suspect that the animal was suffering with rabies or hydrophobia.

It appears that Mr. Buck is an attorney at law, practicing his profession in Baltimore City, but having his residence in Baltimore County. At his county place was a handsome young collie dog, belonging to him, which was proven to have been naturally of a quiet and gentle disposition; and there also, in his employ, was a man of all work, by the name of Amos Triplett.

The defendant usually went to his office in the city early in the morning and returned to his home in the evening. On Wednesday evening, November 20, 1907, as the defendant and his hired man were on their way home from the railroad station, Triplett informed his master that the dog had been acting strangely, that it was restless, running about the place and barking, and that he thought there was something unusual the matter with the dog. Thereupon the defendant, as a precaution, directed Triplett to confine the dog.

Other conversations took place between the defendant and Triplett concerning the animal in which Triplett stated that the dog was acting suspiciously, and expressed his apprehension that the dog was developing hydrophobia, but the defendant made light of the suggestion and told the man not to be so fearful.

On Saturday afternoon, November 23rd, the defendant being at home and hearing the dog barking in the stall where it was confined, went to look at it. He says in his testimony that the dog appeared to be all right except he was barking. He inquired of Triplett if the dog had been fed and watered, and being told that it had, he resolved to turn the dog loose.

But Triplett was still apprehensive, so defendant got an old shot gun, loaded it, and gave it to Triplett with instructions to shoot the dog as it came out, if it acted suspiciously. The dog was then set free. It went first to its master, who patted it, and then to the house, where Mrs. Buck says she saw it eating; that she patted it, and that the dog acted as he naturally did at any time.

About an hour later, the plaintiff was bitten in the wrist by the dog near her home, about a quarter of a mile distant from Mr. Buck's house, while getting a piece of wood along the road side.

Triplett testified that on Wednesday he observed the dog acting in an unusual manner. It was restless, running about the lot and showing unusual symptoms. That by Mr. Buck's direction he confined the dog. That all the while it was confined, the dog was barking and yelping. That he tried to attract the dog's attention but it would not respond. That when Mr. Buck suggested on Saturday turning the dog loose, he told him he did not think the dog was safe to be turned out, that he thought the dog was getting hydrophobia.

The subsequent history of the dog is, in effect, that it travelled with its head down, snapping at the ground. That its tail was hanging low between its hind legs, and that it made a peculiar snorting noise. It travelled several miles from its home, and at about five o'clock the same evening was killed by a young man for biting his pet pig. Several witnesses, who saw it meanwhile, as it travelled the road, testified that it acted quite naturally so far as their observation went. A few days after being killed, its head was taken to the Pasteur Institute, where certain tests were made to discover if the dog was afflicted with rabies or not.

By advice of physicians there, Miss Brady attended the City Hospital, and for twenty-one days took the Pasteur treatment for the prevention of hydrophobia.

The verdict of the jury was for $1,000, upon which judgment was entered, and the defendant has appealed.

There are fourteen bills of exception in the record, thirteen to the testimony, and one to the prayers, all of which we will now proceed to consider in their order:

The first and second exceptions relate to a conversation that took place between the plaintiff and defendant subsequent to the injury complained of. At the trial of the case in the Court below Miss Brady, in answer to questions, stated that Mr. Buck in that conversation expressed his regret at the occurrence and said that his man did not want him to turn the dog out, because he thought the dog was mad, and that he himself afterwards, thought the dog had hydrophobia.

The declaration that Triplett did not want the dog turned out because he thought it was mad, was certainly admissible as it tended to prove scienter on defendant's part, and was therefore a declaration against interest. The expression of his regret at the occurrence, did credit to his humane instincts, and its communication to the jury could not therefore prejudice him.

The testimony to the effect that the defendant said he thought afterwards himself that the dog had hydrophobia, could do him no injury, as under the very proper instructions of the Court, he was only responsible, if at all, for the want of proper care and caution in setting the dog free, in disregard of the previous advice and warning given him by Amos Triplett.

The third and fourth exceptions were to the following questions put to Miss Brady:

Q. "Did you have any fear?"

Q. "Have you any fear now?"

To the first question the witness answered: "Well, I didn't know, I thought I might get the hydrophobia, I didn't know this was a sure cure or not."

To the second question she answered: "Yes, sir; I still worry about it."

We think the lower Court rightly permitted these questions to be answered.

In *Godeau* v. *Blood,* 52 Vt. 251, the Court said: "The apprehension of poison from the bite of the dog, and the fear and solicitude as to evil results therefrom—all pain, anguish, solicitude, occasioned by the bite—were proper matters for consideration by the jury in estimating the damages."

In *Friedman* v. *McGowan,* 1 Pennewell (Del.), 439 (42 Atl. 723), the Court held that the following question was relevant though objectionable, because leading: "Have you, or not, been afraid of hydrophobia ever since you were bitten by the dog?" In neither of these cases was there any evidence that the dog was rabid.

In this case, there was evidence tending to show that the dog was afflicted with hydrophobia, and we think the evidence was relevant. If the form of the questions was deemed objectionable on the ground that they were leading, such objection should have been made at the time they were asked of the witness. *Jones* v. *Jones,* 36 Md. 447.

The fifth exception was disposed of by the granting, subsequently of a motion to strike out the answer excepted to.

The sixth and seventh exceptions were taken to the following questions and answers:

Q. "What, if anything was said by Mr. Buck of the treatment of hydrophobia, at the time you let the dog loose?"

Ans. "Well, I expressed some fear for my children and he said not to be so fearful; he said if they got bitten they could just go to the city and have the juice inserted into them and they would be well in a short time."

Q. "Just tell his exact words?"

Ans. "Well, he said don't be so fearful, if they do get bitten you can go to town to that dutchman and have the juice squirted into them and they will be well before night; that is the best of my judgment his words."

We see no objection to this testimony. It tended to show that Triplett seriously apprehended danger from the dog, and that he communicated his fears to the defendant.

The defendant in his testimony said: "That Triplett was a reasonably intelligent man, though a little apprehensive

and nervous. That he was a very good man, and told everything in a straight way."

As Triplett was given charge of the dog in Mr. Buck's absence from home, and had ample opportunity to observe the dog's behavior, the answer complained of was evidence from which the jury could form an opinion as to whether or not the defendant treated Triplett's warnings more lightly than a prudent man should have done under the circumstances.

The eighth exception was to the admissibility of evidence concerning the dog's behavior on an occasion when Triplett thrust a stick at it while it was confined.

Triplett testified that the dog took hold of the stick and seemed to be cross and angry, though its general disposition previously had been good. It does not clearly appear from the evidence whether this particular incident was communicated to Mr. Buck or not, but Triplett did tell the defendant on more than one occasion that the dog was acting strangely and from his observation of it, he thought the animal was developing rabies.

Besides this, Triplett was given charge of the dog, and under such circumstances knowledge of the servant is the knowledge of the master. In the case of *Baldwin* v. *Casella,* L. R. 7 Exch. 325, an ordinary carriage-dog was kept in a stable of the defendant, and was under the care and control of the defendant's coachman, who lived there. The dog was known to the coachman to be cross and to have knocked down a child and scratched it. The defendant, however, supposed the dog to be harmless and allowed it to play with his children. In an action by an infant for a bite inflicted by the dog a verdict was found for the plaintiff.

In that case Sir Samuel Martin said: "The dog was kept in defendant's stable, and the defendant's coachman was appointed to keep it; the coachman knew the dog was mischievous, and it is immaterial whether he communicated that fact to the master or not; his knowledge was the knowledge of the master."

We find no error in the ruling of the Court on the eighth exception.

The ninth, tenth and eleventh exceptions relate to substantially the same kind of evidence that we considered under the first and second exceptions, and what we there said disposes of these also.

The twelfth and thirteenth exceptions were taken to the refusal of the trial Court to strike out the opinion evidence of Drs. Keirle and Haines, two physicians from the Pasteur Institute in Baltimore, both of whom testified, that from their investigation of the dog's head, the animal had hydrophobia.

The ground for the motion to strike out was that all the work of making the experiments at the institute was not done by one person, but that different parts of the process of investigation were performed by different members of the staff employed there, and that therefore the witnesses' opinions were based upon hearsay.

The testimony of all three of the persons who took part in the tests was admitted subject to exception. Dr. Herbert H. Haines testified that he had been Dr. Keirle's assistant at the City Hospital for four years; that he made the prelim'nary test, and that it was positive, indicating hydrophobia. That he was in the courtroom and heard the testimony cf Miss Brady and of Amos Triplett, and that if the facts stated by them were true the history of the dog was typical of a mad dog. That his opinion, based on his examination and the history, was that the dog had hydrophobia, but he would not swear to it as a fact.

Dr. C. H. McClean testified that he had been assistant to Dr. Keirle in the Pasteur Institute for two years; that his work in November, 1907, was done immediately under Dr. Haines, who was his senior at the time in charge of the laboratory; that he took out the medulla from the dog's head and put it in a tube with glycerine and labeled the tube; that subsequently he inoculated two rabbits with virus from this tube and put them in a box. The box was labeled with a card

label; that he made the entries in the record book and on the card label.

The record book and card label were then offered in evidence, without objection.

Both the card and the record book contained the following · entries, among others:. "No. 674. Brady. Box E."

Both the rabbits appear to have been gray in color,, as that word appears twice in the record book and twice on the card label. One rabbit died · prematurely, and the letters ˙ "P. D." were written before the word "Gray" on the card label. Before the other word "Gray" on the card was an "O" in red ink, put there by Dr. Keirle, to indicate that that rabbit developed rabies.

The witness was then asked what .opportunity there was for mistake in making ˙ the experiments, and replied that: "There was no more liability of error than there was in any other scientific work."

Dr. Keirle testified that from the books and records the dog had hydrophobia.

The defendant's motion to strike out testimony was directed only against that of Drs. Keirle and Haines. Dr. Mc-Clean's was not objected to.

In *Owen's Case,* 67 Md. 313, this Court said, quoting from 9 *Wall.* 677: "There can be no doubt but the daybooks and ledger, the entries in which were testified to be correct by the persons who made them, were properly admitted. They would not have been evidence *per se,* but with the testimony of the witnesses accompanying them all objection was removed."

Dr. McClean testified that he did the work of inoculating the rabbits and made the entries, and that Dr. Keirle made the "O" in red ink, to indicate that one of the rabbits inoculated by him died of rabies.

The weight and sufficiency of evidence are of course matters for the consideration of the jury, but whether there be any evidence or not is a question for the Court.

In this case the investigation to discover whether the dog had rabies or not, seems to have been scientifically and carefully made, according to the established system in vogue at the Pasteur Institute.

All the physicians who took part in the experiments testified as to the part performed by them respectively, thus making a complete chain of investigation, and the entries in the record books and on the card were admitted in connection with the testimony of the witnesses. We think that under the circumstances the testimony as to the result of the experiments was admissible.

Objection is also made in the brief of the appellants to the evidence of Dr. Haines, because some of his testimony was based in part upon the evidence of two witnesses whom he heard testify at the trial of the case below, and not upon a hypothetical statement of facts. *Edelin* v. *Sanders*, 8 Md. 118.

But no objection on this ground appears to have been made to this evidence at the time it was given, and the motion to exclude is based on other grounds entirely. As the question does not plainly appear to have been decided by the Court below, it cannot be raised on appeal. *Code,* Art. 5, sec. 9.

No question was asked Dr. Haines based upon evidence in the case, and if the point now raised was deemed important, objection to the doctor's statement should have been made at the time in the Court below.

The fourteenth exception is to the ruling of the trial Court upon the prayers. The defendant's first prayer, which was rejected, asked the Court to instruct the jury that their verdict must be for the defendant. In defense of this prayer the learned counsel for the defendant says in his brief that hydrophobia was not proved, and "if the dog did not have hydrophobia there was no negligence to be imputed to the defendant, because the dog was conceded to be of an affectionate and gentle disposition."

But it could not be declared as a matter of law that in turning the dog loose, with the knowledge he possessed at

the time of its behavior under the observation of his man Triplett, 'the defendant acted with that degree of caution which is required of a reasonably prudent man under such circumstances.

Whether the dog was mad or not may be matter of suspicion, and yet it was not enough for defendant to say: "I did use a certain precaution." He ought from the grave nature of the disease suggested to him, to have put it out of the animal's power to do harm. *Addison on Torts, sec.* 264; *Jones v. Perry,* 2 Espinasse, 482. The care should have been commensurate with the serious consequences of a miscarriage. *Bishop on Non-Contract Law,* sec. 1235. Whenever the owner of a dog has reason to even suspect that the animal may be afflicted with hydrophobia, it becomes his duty to be very circumspect and to use every precaution to prevent the animal from inflicting an injury on any creature.

We cannot say the precaution here was sufficient and think the Court below was right in rejecting this prayer.

We have examined the other rejected prayers of the defendant and, without discussing them in detail, we think they were properly rejected. An examination of all the instructions actually granted, taken together, convinces us that the case was fairly and properly submitted to the jury.

Finding no reversible error in any of the rulings of the lower Court, the judgment will be affirmed.

*Judgment affirmed with costs.*