## LAURENCE H. BAKER ET AL. *v.* HOWARD COUNTY HUNT ET AL.

[No. 34, October Term, 1936.]

160

_Decided November 25th, 1936._

The cause was argued before BOND, C. J., URNER, OF-FUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Edward A. O'Brien* and *William Milnes Maloy,* for the appellants.

*Francis Key Murray* and *Daniel M. Murray, Jr.,* for the appellees.

OFFUTT, J., delivered the opinion of the Court.

In 1924 Dr. Laurence H. Baker and Rebekah W. Baker, his wife, acquired a small farm of about sixty-five acres, located in the Fifth Election District of Howard County on the Clarksville Turnpike and the Patuxent River, a few miles from Ellicott City. For a time Dr. Baker used the farm as a "week end escape," but later he and his wife occupied it as a permanent home. From 1926 to 1929 he was the executive secretary of the Johns Hopkins Medical School. In connection with that work he became interested in the effect of well balanced nutrition on stock, and began a series of experiments on rabbits to determine

whether over a long period a well balanced diet would result in improving the stock. He kept the rabbits used in those experiments on the farm. There he also raised hogs and chickens, kept a garden, and raised buckwheat and other crops. He and his wife lived there intermittently until about 1932, and from that time on he has resided there permanently.

Howard County is, and for many years has been, a fox hunting country, and it is no unusual thing for land-owners to keep packs of fox hounds, but it does not appear that prior to 1930, when the Howard County Hunt was formed, there was any organized association of the followers of the sport. That club is an unincorporated association of more than seven persons, which occupies a farm at the junction of the Triadelphia Road and the Glenelg Road, also in the Fifth Election District of Howard County, some six or seven miles from the Baker farm. The club itself owns no hounds, but employs as its huntsman Philip Bowen, who furnishes and hunts a pack of hounds for it.

Weather permitting, the hounds are hunted three days a week throughout the hunting season, from early in September to April, over a territory which includes the Baker farm. In 1931 Dr. Baker, it was said, noticed fox hounds accompanied by riders in red hunting coats on his farm, and also heard "the horn carried by fox hunters." At that time he paid little attention to them, for he had then no "animals of any great quantity," and it made "very little difference." But by 1933 his stock of rabbits had greatly increased, and on January 14th of that year, near sunset, while he was feeding the rabbits, he and his wife heard a great "hue and cry" at the back of the farm, and his wife said, "It looks as though the dogs were at our rabbits again." He "started off to one of the other points," and before he got back to her the dogs were swarming all around the place. Mrs. Baker attempted to drive them off, they "seemed to back right against her," she screamed that she was bitten, he "rushed and hollered at the dogs, and before we knew it they were in the

woods." Following that incident, Mr. T. Stockton Matthews, president of the club, wrote Dr. Baker a letter in which in part he said:

"I was shocked to learn of the most unfortunate annoyance and damage caused you and Mrs. Baker last Saturday by hounds of the Howard County Hunt. I immediately got in touch with Mrs. Clark and others whom I thought might know some more of the circumstances, with the concern particularly of the injury to Mrs. Baker and the hope of avoiding the possibility of any serious infection from the wound.

"It is distressing to all of us that such an unprecedented and unfortunate accident should have happened. In the conduct of the Hunt and in the control of the hounds, we have endeavored always to merit the goodwill and cordial interest of all those in the community who are in sympathy with good sport and with the aims and purposes of the organization to further the best interest of Howard County."

Notwithstanding the assurances in the letter, Dr. Baker complained that no real effort was made to keep the hounds off his property, that they trampled his crops, broke some hot frames, disturbed his rabbits and his chickens, and so annoyed Mrs. Baker that she left the place, and that on one occasion in February, 1936, he had been compelled to shoot several of them to get them off his property, where they were frightening his chickens. On March 9th, 1936, he and Mrs. Baker filed the bill of complaint in this case against the Howard County Hunt and Philip Bowen, in which, after reciting these facts, he prayed: "That the said Howard County Hunt and Philip Bowen, their agents, servants and employees, they and each of them may be enjoined from hunting across your Complainants' property or permitting the pack of Fox Hounds owned by them or in their custody from hunting or overrunning the land of your Complainants or in any manner interfering with your Complainants enjoying the peaceful possession of their property."

In their answer the defendants averred that "members

of the Howard County Hunt have only ridden through the Complainants' property on one occasion during the past five years; and the said pack of fox hounds have crossed the Complainants' property not more than four times during said period of five years." They further alleged that the injuries to Mrs. Baker "were suffered" more than three years before the suit, and that whatever rights she might have had "by reason" of those injuries "were barred by limitations and laches," and, while they admitted that "their pack of fox hounds" did cross the Baker property in February, 1936, they denied that they terrified the chickens or destroyed "freshly laid eggs," and as to that occasion they further said "that Laurence H. Baker, one of the above named Complainants, did wilfully and without any just cause whatsoever, deliberately shoot into the said pack of fox hounds, as a result of which one of them died shortly thereafter and another is seriously and permanently injured, and these respondents aver that the said pack of fox hounds at the time of the shooting as aforesaid in no way molested the Complainants or their property but were in the act of pursuing a fox."

The case was tried on the issues made by those pleadings and at the conclusion of the case the court dismissed the bill.

The important questions presented by the appeal are whether equity may afford injunctive relief against a series of trespasses which, while not continuous, are nevertheless part of a single course of conduct which seriously interferes with the right of a landowner to the peaceful enjoyment of his property, and, if it may, whether the appellants have made out a case for such relief.

Dr. Baker and his wife testified affirmatively that from 1931 until the filing of this suit the defendants' hounds were repeatedly on their farm. Cardwell F. McCartney, a share cropper, who farmed a field of buckwheat on the farm, said he had seen them on the place every year since 1931, and that he himself "ran them out" twice when they were "doing a good deal of damage" to the buckwheat.

William N. Johnson, a neighbor, occasionally employed by Baker, said: "Q. At any time while you were present on the place did you see any riders of the Howard County Hunt? A. Yes, sir. * * * I would say almost every Saturday. Q. I am referring to the riders. A. Yes, sir; the riders. We would see them going across the back end of the place. * * * Q. How about the dogs? Did you see the dogs of the Howard County Hunt on Dr. Baker's property? A. Yes, sir. Q. How often would you see them? A. Every time the Hunt would go through. * * * Q. What would you see the dogs doing when they were on the property? A. See them in the chicken yards, and running over the place, and running through the gardens. Q. Ever see them down at the pig-pens? A. Yes, sir. Q. What were they doing there? A. I saw them all around the pig pen. Q. As a result of that, what were the pigs doing? A. They had been running."

Jesse Titus, who was employed by Baker on the farm in the fall and early winter of 1935-1936, said that he saw the hounds on the Baker farm four times in the four months of his employment there, and he gave this graphic description of the last occasion on which he saw them: "But in January, one Saturday afternoon I was down fixing the fences and there was a bunch of dogs—I would say twenty-five or thirty, I didn't count them. They came down through Mr. McCartney's farm adjoining Mr. Baker's. His hog lot is down at the lower end of the field." "Q. Mr. Baker's? A. Yes, sir; and I was down there feeding them. These hounds got part way down through to the pigs. Some came up past the pig pen. One sow was just down in pigs. They was all over. Me and my son-in-law had to step out of the way or be run over. They went up on top of the hill and ran down through the chicken yard. Part of them got tied up in the chicken yard. One got out. This particular dog was the largest hound I have ever seen, and he had an awful time getting out."

The testimony offered by the defendants was largely negative and inferential. It was directed mainly to devel-

oping an insinuation that Mrs. Baker had left home, not to escape the fox hounds, but to earn a legacy, a wholly irrelevant and quite gratuitous inquiry, to proving that the gentle and timid nature of defendants' hounds precluded the possibility of their having attacked Mrs. Baker, and that their fidelity to the business in hand during the hunts made it extremely unlikely that they would leave the scent of the fox to molest such irrelevant creatures as rabbits and chickens, to showing that, while the hounds were not always in sight of the hunters, the hunters were so familiar with their notes they could tell where they were at remote distances, at times as far as two miles, not "within a foot or so, either side," but whether they were on the Baker property or the McCartney property which adjoins it. There was also expert testimony as to the habits of foxes, the peculiarities of the scent as affected by the weather, that, when the earth is warmer than the air, the scent is better than when a south wind is blowing and the air is warmer than the earth.

Mr. Bowen, the huntsman, testified that his hounds were "what is known as American fox hounds" and were distinguished for their amiable dispositions and loud notes. Indeed, when asked about an occasion in January, 1932, he gave this testimony: "Q. What kind of disposition did the hounds that comprised the pack that day, have? A. Good. Q. Do American fox hounds bite people? A. No. Q. There has hardly ever been such a thing? A. No, sir. Q. Do your hounds bite? A. My hounds are very friendly, and good, kind disposition, and I never saw one act mean in my life. They are all that way."

It also appeared from his testimony that, on the occasion when several of the hounds were shot by Baker, Bowen knew they were on the Baker property, but, prior to the shooting had made no effort to call them off, although he said, "I can stop them whenever I find them, any place at any time."

Mr. Amory T. Lawrence, also present on that occasion, gave this description of what happened after the shooting: "I don't know the hounds so well as Mr. Bowen. I

would not have noticed that the hounds had stopped, except that one hound came right back to Mr. Bowen, sat down there and looked in his face, and trembled. The other hounds kept on and circled another time in the same line they had the first time. They completed the second and were on their third loop. Another member of the Hunt, who was with us, shouted, 'There goes the fox.' He forgot to say, 'Tally ho,' in the excitement and the fox started to circle down there and just about that time it was getting dark. Mr. Bowen started to call in the hounds, and the fox went across the road, and the dogs lost him as he went across the road. After he called some time we could see there were still a few missing. We looked behind, and there was one dog limping down the road."

Following the letter from Matthews to Baker, there was a suggestion from some source that the club place a fence around Baker's farm. When cross-examined about that, Augustus Riggs III, the Master, gave this testimony: "What do you think was the reason he wanted a fence around the property? A. The same reason he wanted to say this pack of hounds bit Mrs. Baker. Q. After you heard he wanted a fence around his property did you make any effort to have your huntsman keep the hounds off the property? A. We never went near there intentionally. Q. The hounds have been there after you heard about the fence? A. Yes. Q. After you heard about the fence you never made any effort to keep away from that part of the country. A. We tried to keep away from Dr. Baker's. Q. And did you instruct Mr. Bowen not to allow his dogs to go on Mr. Baker's place? A. No, because they very seldom went over toward Mr. Baker's."

It also appeared without contradiction that packs of fox hounds other than those of defendants are kept by different persons in the neighborhood of the Baker farm, but there was nothing in the evidence to indicate that they went on the property. It was also intimated that defendants had at different times cut the wire fences on the Baker farm, but, while it appeared that the fence had been cut, there was no evidence of any kind to connect the defendants with those particular trespasses.

Without further elaboration of the evidence it is sufficient to say that it shows without any substantial doubt that the defendants' hounds have repeatedly overrun the Baker farm, have done substantial injury to their property, that defendants have made no serious effort to prevent the trespasses, and that the resulting damage is of such a character that the Bakers can obtain no adequate relief therefor in an action at law. Their property is their own; they have an unquestionable right to enjoy it in peace and quiet without molestation or hindrance, and to use it for such purpose and pursuits as they will, so long as their use of it does not harm others. On the other hand the defendants devote a part of their leisure to the pursuit of an ancient, exhilarating, and healthful sport, which is not only lawful, but which for centuries has added to the health and to the pleasure of those who love to combine the freedom and the freshness of the open spaces with the thrills of the chase, the music of the hounds, the rushing air, the creaking of saddle leather, the dash of the thoroughbred, and the sights and sounds of the countryside in the crisp air of the fall and the early winter. They, too, have an unquestionable right to indulge that inclination, but only so long as they do not permit it to interfere with the rights of others.

Much interesting learning and some space have been devoted by counsel for the parties to this appeal in tracing the origin, growth, and development of the relative rights of fox-hunters and the owners of the land over which they hunt. Indeed, that search has extended from *Bacon's Abridgement* (1856) to *Adkin's Law of Forestry and Law Relating to Trespass and Game* (London 1914), but in the end there is no dispute, as there can be no doubt, that the rights of the fox-hunter are subordinate to the rights of the landowner, and that, if the hunter himself goes on the lands of another against the owner's will, he is a trespasser.

Any doubt as to that principle was long since put at rest in England, and has never been recognized in America. The modern law on the question was clearly and

moderately stated in *Paul v. Summerhayes,* 4 Q. B. D. 9, where Lord Coleridge said: "The sport of fox-hunting must be carried on in subordination to the ordinary rights of property. Questions such as the present fortunately do not often arise, because those who pursue the sport of fox-hunting do so in a reasonable spirit, and only go upon the lands of those whose consent is expressly, or may be assumed to be tacitly, given. There is no principle of law that justifies trespassing over the lands of others for the purpose of fox-hunting. * * * But the evidence clearly showed that in the case of fox-hunting, as ordinarily pursued, the object of destroying the animal is only collateral. The interest and excitement of the chase is the main object. * * * If persons pursue the fox for the purpose of sport or diversion, they must do so subject to the ordinary rights of property. * * * It may well be doubted, in my opinion, whether, even if the case were one in which the destruction of a fox as a noxious animal was the sole object, there would be any justification."

In respect to the liability of persons who either send dogs on the land of another in pursuit of game or of a fox, which is not ordinarily classified as game *(Paul v. Summerhayes, supra)*, or hunt them in a neighborhood when they have reason to know that the chase will probably take them over land on which they have no right to go, the law is not so certain. It was said by some early commentator, seeking a way out of the maze, that "dog law is as hard to define as dog latin" *(Citizens' Rapid Transit Co. v. Dew,* 100 Tenn. 317, 45 S. W. 790), but since then much of the uncertainty as to the responsibility of the owners of dogs for their trespasses has disappeared. The difficulty of stating with certainty the status of a dog before the law is said to inhere in its nature and is inseparable from its known peculiarities, the difference in breeds, its diverse uses, the diseases to which it is subject, its infirmities of temper, and the impossibility of predicting when or how it will break through the artificial restraints of discipline and revert to its orig-

inal and instinctive ferocity. 1 *R. C. L.* 1112. But, as with other branches of the law, early doubts have disappeared, and others have succeeded them, in a natural process of evolution in which the law has changed to harmonize with changed conditions.

Thus it is broadly stated that at common law the owner of a dog is not liable for its mere trespass on land of its own volition (3 *C. J.* 150, *Read v. Edwards,* 17 C. B. (N. S.) 245, 144 Reprint, 99), and that is probably still the law in many jurisdictions, although its soundness is questioned in a well-reasoned opinion in *McClain v. Lewiston Interstate Fair & Racing Association,* 17 Idaho, 63 104 P. 1015, 1021. In that case (pages 80-82) it is said: "There would seem to be no reason why the owner of a dog, who unlawfully and negligently permitted trespass upon the rights of another and permitted the animal to go upon the premises where such animal had no right to be, and to invade the legal rights of another, and, while such trespasser, commits an injury to the person or property of one whose rights have been invaded, should not be liable for such damages. * * * It is true the early courts, dealing with the question of trespass of a dog, held that a different rule applies to that of other domestic animals, and that the owner of a dog, independent of statute, was not generally liable for an injury committed by it when trespassing, unless he had previous knowledge of its vicious propensities. 2 *Am. & Eng. Encyc. of Law* [2nd Ed.] 368. But we are unable to discover any reason for this rule, or why dogs should be placed under a different rule than other domestic animals, as to the owner's liability for injuries done when trespassing. * * * And we believe, both upon reason and authority, that when a dog invades and trespasses upon the legal rights of a person and injures person or property, and such invasion and trespass is the result of the negligence of the owner, the owner is liable for the damages done."

Whatever may be said for the soundness and good sense of that reasoning, it is contrary to what seems still to be the weight of authority, and in this state, at least, the

rule stated in *Goode v. Martin,* 57 Md. 606, that to subject the owner of a dog to liability in damages to one injured by it, it is necessary to show that the owner had knowledge that, because of its disposition, it was likely to inflict such injuries, has never been overruled, but in *Buck v. Brady,* 110 Md. 568, 73 A. 277, in the case of a mad dog, the rule was modified to the extent of placing upon the owner, in an action against him for injuries inflicted upon the plaintiff by his dog, the burden of showing that he exercised the caution which a reasonable man would have shown to detect the danger and guard others against it.

The rule as thus stated is in substantial accord with a statement found in *Halsbury's Laws of England* (2nd Ed.) vol. 1, sec. 972, that: "The owner of a dog is not answerable in trespass for its unauthorized entry into the land of another, often described as an unprovoked trespass. But if a man willfully send a dog in another man's land in pursuit of game he is liable in trespass, although he did not himself go on the land. So also if he allow a dog to roam at large, knowing it to be addicted to destroying game."

And in 1 *R. C. L.* 1118, it is said: "It seems that where a dog roams on another's land of its own accord and does damage or inflicts injury to persons, animals or property there, proof of the owner's knowledge of the dog's propensity to commit the evil complained of is necessary to a recovery. This distinction in the case of a dog is due to the fact that the common law, regarding the straying of a reputable dog as unlikely to cause an injury, did not impose on its master the duty of restraining it. But if, by the voluntary acts of the owner, the dog is unlawfully in the place where the injury was inflicted, as where a person takes his dog with him when trespassing on the premises of another, his liability does not depend on his previous knowledge that the dog was vicious."

From these cases and the statements of textwriters it may be said that, while the owner of a dog which he has no reason to believe is dangerous or likely to inflict harm

upon the persons or property of others, is not liable for its trespasses, committed of its own volition while roaming abroad, he is liable if he either takes it himself where he knows that, because of its training, nature, and instinct, it will probably damage the property of others, or if with that knowledge he permits it to stray beyond his control.

Applying that rule to the facts of this case, the conclusion seems inevitable that, after the defendants in this case had been warned in 1933 that their hounds, while hunting in the neighborhood of the appellants' farm, were likely to trespass thereon and inflict damage upon his property, they were under a duty to so control their hounds as to prevent further trespass. Nor is there any serious doubt that, in violation of that duty, they hunted their hounds in the neighborhood of appellants' farm, knowing that, under the impulse of their instincts and training in following the scent, they might and probably would trespass thereon. Nor is there any doubt that, as a result of appellees' indifference to appellants' rights, their negligence in permitting their hounds to be beyond their control in the neighborhood of appellants' farm, appellees' hounds did overrun appellants' farm, disturbed and injured their poultry, rabbits and pigs, and annoyed both Dr. Baker and his wife.

The common law, that the owner of a straying reputable dog is not liable for its trespasses because it was not likely to do much damage (1 *R. C. L.* 1118), cannot well be applied to a pack or body of fifteen, twenty, or more hounds, running as a pack on the same trail, for it is too obvious for comment that such a pack may do substantial damage even to crops. The notion that a landowner is without remedy for damage or injury suffered as the result of such an invasion of his rights, or that the law affords him no protection against a repetition thereof, lacks substance and reality.

Appellants contend that their remedy is in equity; appellees say that appellants are not entitled to equitable relief, first because they have an adequate remedy at law,

and, second, because they do not come into equity with clean hands. The second objection is based upon the fact that Dr. Baker shot several of the appellees' hounds while they were molesting his poultry. It is true that, apart from a statute conferring it, a landowner has no right to kill a dog which is merely trespassing (3 *C. J.* 153), but even at common law he may kill it in defense of his person, his property, or of other persons, where circumstances justify a reasonable belief that so extreme and drastic a measure is necessary to protect himself, his family or his property from harm. *Id.* 153-158. And in this state there is express statutory authority for killing any dog: "Any person may kill any dog which he sees in the act of pursuing, worrying, wounding or killing any poultry or live stock, or attacking human beings whether or not such dog bears the proper license tag required by these provisions. There shall be no liability on such persons in damages or otherwise for such killing. Any unlicensed dog that enters any field or yard shall constitute a private nuisance and the owner or tenant of such field or yard, or other agent or servant, may kill such dog while it is in the field or yard without liability or responsibility of any nature for such killing and any person may kill a female dog running at large while in heat without liabilities therefor." Code (1935 Suppl.) art. 56, sec. 270.

Baker testified that when he shot the hounds they were actually in his chicken yard, "swarming all through the yards," that "some of his" chickens were dead, others were frightened and dashed against the chicken house, and as a "result" he had to kill three of them. That testimony was not contradicted, but, on the other hand, was corroborated by the witness Johnson, who said that, when they were shot, the hounds were running through the chicken yard. Under such circumstances it cannot be said that Baker's act in shooting the dogs was so tortious as to place him beyond the pale of equitable relief. Assuming that the dogs were not interested in the chickens, but merely ran through or over them in their pursuit of the fox, Dr. Baker could not be expected to calmly

analyze their motives in invading his chicken yards, when actually the chickens were flying in all directions before them.

Nor can it be said that appellants had an adequate remedy at law. Assuming that they could have recovered damages in an action at law against the appellees for the repeated invasions of their property, it does not follow that such damages as they might have recovered would have been adequate compensation for the injury done them.

First, because such injuries were in part intangible and incapable of measurement. Dr. Baker was conducting a series of experiments on rabbits. That work was interrupted and its value nullified by the trespassing hounds. The law affords no adequate measure of damages for such an injury. Appellants also attempted to use their farm as a refuge for birds and small animals. The repeated trespasses of the hounds interfered with that plan. The threat of the continued trespasses of the hounds, for those other reasons, seriously interfered with their reasonable enjoyment of the property. Even though the hounds were, as appellees contended, "good and kind," that they never acted "mean," and were never known to bite anybody, the Bakers should not be expected to rely with complete confidence upon the mildness of their tempers, in view of the fact that they had "scrambled up" on Mrs. Baker, tore her clothes, took the skin off the knuckles of both hands, and bit her in the left hand. For the actual physical injuries there may have been an adequate legal remedy, but for the interference with appellants' enjoyment of their property, as affected by the threat of continued recurrences of such incidents, the law affords no adequate relief.

Second, where it appears that the defendant manifests an intention of persisting in the perpetration of unlawful acts, the expense, annoyance, and trouble of prosecuting numerous actions at law to recover trifling damages render an action at law an inadequate remedy.

To justify refusal of equitable relief on the ground that

the appellant therefor has a remedy at law, the legal remedy must be fully adequate and complete *(Miller's Equity Proc.,* p. 678; *Whalen v. Delashmutt,* 59 Md. 250; *Chesapeake & Potomac Telephone Co. v. Tyson,* 160 Md. 298, 153 A. 271), for, as stated in *Fletcher, Equity Pleading & Practice,* p. 246, "The remedy at law which precludes relief in equity must be as practical and efficient to the ends of justice and its prompt administration as the remedy in equity."

Early cases did hold that equity would not relieve against trespasses even though continuing, but it is long since settled that equity will relieve against continuing *(Whalen v. Delashmutt, supra),* or repeated trespasses, committed in pursuance of a single plan or purpose. *Gilbert v. Arnold,* 30 Md. 29; *Georges Creek Coal & Iron Co.'s Lessee v. Detmold,* 1 Md. 225. In *Waring v. Stinchcomb,* 141 Md. 569, 583, 119 A. 336, 340, the court quoted with approval this statement, found in *Shipley v. Ritter,* 7 Md. 408: "It is the settled law of this state, that although an injunction will not be granted to restrain a trespasser merely because he is a trespasser, yet equity will interfere where the injury is irreparable or where full and adequate relief cannot be granted at law, or where the trespass goes to the destruction of the property as it had been held and enjoyed, or * * * to prevent multiplicity of suits."

A paraphrase of that statement is found in *White v. Flannigain,* 1 Md. 525, 543.

"In the case of *Amelung v. Seekamp* (9 G. & J. 468), the court adopted the views of Chancellor Kent, in *Jerome v. Ross,* 7 Johns. Ch. (N. Y.) 315, and also the views of Justice Story, in his work on *Equity Jurisprudence.*

"In the case of *Jerome v. Ross,* Chancellor Kent very fully reviews the course of decisions in England, and in the State of New York, and, as we understand his opinion, recognizes the following principles:

"1st. That an injunction will not be granted to restrain a trespasser, merely because he is a trespasser.

"2nd. But that an injunction will issue where the in-

jury is irreparable; or, where full and adequate relief cannot be granted at law; or, where the trespass goes to the destruction of the property as it had been held and enjoyed; or, where it is necessary to prevent multiplicity of suits in cases where the right is controverted by numerous persons, each standing on his own pretensions."

In a note to that case, by William H. Perkins, Jr., cases supporting it are collected.

Appellees leaned rather heavily upon the case of *Calvert v. Gosling* (Q. B. Div.), 5 Times L. R. 185, as authority for the contention that equity will not interfere to prevent the repetition or continuance of a wrongful act. In that case certain landowners complained that Gosling hunted a pack of hounds over his property. Gosling's defense was that he had no intention of trespassing on plaintiffs' lands and had ordered his huntsmen to keep the hounds from crossing them. The court denied the injunction because no case was shown of an "intention to trespass on the lands of the plaintiffs," and weight was given to the suggestion that it was impossible to keep literally the undertaking that the hunt would not trespass on plaintiffs' land, because no one could tell where the fox would go, and that the hounds would follow the fox. It was rather cold comfort for the landowners to be told that, because their intentions were good, the hunters might invade their lands at will, because no one could tell where the fox would go. They could either have stayed at home or hunted elsewhere. In so far as that case is authority for the proposition that the mere expression of an intention not to repeat a trespass will bar equitable relief against one whose repeated trespasses and past conduct manifest a contrary intention, it is opposed to the settled law of this state and cannot be accepted.

In *Spelling on Injunctions* (2nd Ed.) sec. 14 (1893), it is said: "An injunction lies to prevent threatened trespasses, though the damage be susceptible of compensation, where otherwise there is a probability of the wrong being often repeated. * * *"

Pomeroy, in his work on *Equitable Remedies* (section 496) page 4338 *et seq.*, after stating the minority view,

that equity will not intervene to prevent repeated trespasses by a single defendant, states that: "The jurisdiction of equity to restrain continuous or repeated trespasses rests on the ground of avoiding a repetition of similar actions. * * * When the trespasses complained of are caused by the separate acts of individuals, a multiplicity of suits may be caused to plaintiff either because the defendants are numerous or because a single defendant does the same or similar acts repeatedly. * * *" The other view, and the one sustained alike by the weight of authority and by principle, is that if a defendant manifests a purpose to persist in perpetrating his unlawful acts, the vexation, expense and trouble of prosecuting the actions at law make the legal remedy inadequate, and justify a plaintiff in coming into equity for an injunction." And in support of that conclusion cites, among other cases, that of *Blondell v. Consolidated Gas Co.*, 89 Md. 732, 43 A. 817. That view is also stated in 14 *R. C. L.* 458, and is amply illustrated in a note to *De Pauw v. Oxley*, (Wis.) 13 L. R. A. (N. S.) 173. In *Keil v. Wright*, 135 Iowa, 383, 112 N. W. 633, it was announced as a "familiar doctrine" that equity will interfere where repeated invasions have occurred in the past and are threatened for the future. So much of that case as stated that rule was approved in *Kimple v. Schafer*, 161 Iowa, 659, 143 N. W. 505, although an injunction allowed in the former case was refused in the latter on another ground. The principles implicit in those conclusions are also approved in *Gilbert v. Arnold*, 30 Md. 29.

It follows that equity had jurisdiction to grant relief to the appellants; that they made out a case justifying such relief; that the injunction prayed in their bill should have issued; and that there was error in refusing to grant the injunction and in dismissing this bill.

The decree appealed from must therefore be reversed.

> *Decree reversed, and cause remanded for further proceedings in accordance with the views expressed in this opinion, with costs to the appellants.*