W. W. PEGG v. J. S. GRAY.

(Filed 9 July, 1954.)

**1. Animals § 2—**

The owner of a reputable dog is not answerable in damages for its entry upon the lands of another upon its own volition under circumstances amounting to an unprovoked trespass, but a dog owner may be held liable if it is shown that the dog was not reputable but possessed a propensity to commit the depredation complained of, and that the owner knew, or was chargeable with knowledge, of such propensity.

**2. Same—**

The owner or keeper of a dog for the purpose of sport, who, in the absence of permission to hunt previously obtained, intentionally sends his

dog on the land of another or releases the dog with knowledge, actual or constructive, that it will likely go on the lands of another in pursuit of game, is liable for trespass, even though he himself does not go upon the lands.

**3. Same—**

Evidence tending to show that the owner of dogs, without permission to hunt previously obtained, on numerous occasions intentionally and for the purpose of sport sent his pack of dogs, or released them, knowing that the dogs were likely to go on, over and across the lands of plaintiff in pursuit of foxes, whereby plaintiff sustained substantial damage to his fences and other property, *is held* sufficient to carry the case to the jury on the theory of trespass. The applicability of G.S. 67-2, G.S. 113-104, not presented on the theory of trial.

**4. Appeal and Error § 8—**

An appeal of necessity follows the theory of the trial.

APPEAL by plaintiff from *Patton, Special Judge,* at 1 February, 1954, Civil Term of GUILFORD, Greensboro Division.

Civil action to recover damages for alleged trespasses committed by foxhounds while in the heat of chase.

The plaintiff's evidence may be summarized as follows: He and the defendant own adjoining farms in Guilford County. During most of the three-year period before the commencement of the action, the defendant kept a pack of from seven to ten foxhounds, and with them at frequent intervals during the hunting seasons chased foxes onto and across the plaintiff's lands without his permission and in disregard of his protests.

The plaintiff's farm contains about 340 acres, on which he cultivated tobacco, corn, wheat, and other crops. He also maintained a herd of about 70 beef cattle. These were kept in a barbed-wire enclosed pasture of about 125 acres, with partition fences within the over-all enclosure making smaller pastures, for purposes of rotation grazing, ranging from 6 to 40 acres.

The plaintiff's farm lies between two creeks. On the occasions of the hunts the defendant did not go in person upon the lands of the plaintiff. The foxes were found along one or the other of the creeks next to the farm. After being jumped they usually ran from creek to creek across the plaintiff's farm, through his croplands, and in the course of some of the chases damage was done by the dogs to growing crops. Also, the foxes, when tiring and in close pursuit by the dogs, often would run in and through herds of cattle in an effort to elude the hounds, thus causing the cattle to stampede and frequently to break down barbed-wire pasture fences, and by reason of which the cattle were frightened, wounded, and molested in their feeding habits and impeded in their normal growth. The plaintiff in describing one of the hunts he observed said the cattle, some

60 head, were huddled up against one of the fences and the dogs were just "dodging in and among the cattle . . .—stayed in the herd about five minutes," and caused the cattle to stampede against the fence. The plaintiff further testified he knew the sound of the defendant's "pack of hounds when they were in full cry" and that as many as fifteen or twenty times on the mornings after hearing them chase foxes across his premises, he found his cattle stampeded and injured and his partition fences damaged and torn down. As he put it: "In the last year or so we have completely abandoned the partition fences. They were torn down faster than we could fix them up by these hounds chasing fox and stampeding my cattle. . . . It cost me about $150 a year to repair my fences damaged by these cattle stampeding for the years 1950, 1951, and 1952." (Cross-examination): ". . . I identified the dogs by the tags. Mr. Gray's name was stamped on the tags. I stopped the dogs about 25 times and counted them, over this three-year period. . . ."

The plaintiff's son testified: "I estimate I went with my father to the cattle pasture, in relation to the fox hunt, 25 times to see what was disturbing them. I have seen the dogs run across the pasture through the cattle many times. I would catch them to see whose tags were on them, and all the time they were Mr. Gray's. . . . We have seen cows in the morning after the hunt—they had been cut sometimes . . ."

The evidence also discloses that when the plaintiff protested to the defendant when one hunt was in progress, the defendant replied: "I don't want to hear you say that any more. They (the dogs) are not damaging your cattle. If they kill one of them, I'll pay you for it."

At the close of the plaintiff's evidence the defendant moved for judgment as of nonsuit. The motion was allowed.

From judgment in accordance with the foregoing ruling, the plaintiff appealed.

*Howerton & Howerton for plaintiff, appellant.*

*Hines & Boren, Jordan & Wright, and Charles E. Nichols for defendant, appellee.*

JOHNSON, J. We are not dealing here with a trespass committed by a dog of its own volition while roaming abroad.

It may be conceded as a well-established principle of law that where a dog roams abroad on another's land of its own accord and does damage or inflicts injury to persons, animals, or property there can be no recovery therefor in the absence of special statutory enactment, unless it be shown that (1) the dog was possessed of a propensity to commit the depredation complained of and (2) the owner knew, or was chargeable with knowledge, of such propensity. *Buckle v. Holmes,* 2 K. B. (Eng.) 125, 54

A.L.R. 89. See also: *S. v. Smith,* 156 N.C. 628, 72 S.E. 321; *Banks v. Maxwell,* 205 N.C. 233, 171 S.E. 70.

This principle of law is grounded upon a recognition that by natural instinct and habit an ordinary dog of most breeds is inclined to roam around and stray at times from its immediate habitat without causing injury or doing damage to persons or property. And in deference to this natural instinct of dogs the processes of the early common law eschewed the idea of requiring that they be kept shut up, and instead promulgated the foregoing rule which allows a reputable dog a modicum of liberty to follow his roaming instincts without imposing liability on its master. And so, since early times the law has been and still is that the owner of a reputable dog is not answerable in damages for its entry upon the lands of another upon its own volition under circumstances amounting to an unprovoked trespass. *Buckle v. Holmes, supra; Mason v. Keeling,* 1 Ld. Raym. 606, 91 Eng. Reprint, 1305; *Brown v. Giles,* 1 Car. & P. 118, 171 Eng. Reprint, 1127; *Buck v. Moore,* 35 Hun. (N.Y.) 338; *State v. Donohue,* 49 N.J.L. 548, 10 A. 150, 60 Am. Rep. 652; 2 Am. Jur., Animals, Sec. 105; Annotation: 107 A.L.R. 1323.

However, the rule is different where a dog owner or keeper for the purpose of sport intentionally sends a dog on the lands of another or releases a dog or pack of dogs with knowledge, actual or constructive, that it or they likely will go on the lands of another or others in pursuit of game. In such cases the true rule would seem to be that the owner or keeper, in the absence of permission to hunt previously obtained, is liable for trespass, and this is so although the master does not himself go upon the lands, but instead sends or so allows his dog or dogs to go thereon in pursuit of game.

The gist of the leading English decisions on the subject, with footnote citations of the decided cases, may be found in Halsbury's Laws of England (1911), Vol. 1, page 395, where it is said: "The owner of a dog is not answerable in trespass for its unauthorized entry into the land of another, often described as an unprovoked trespass. . . . But if a man wilfully send a dog on another man's land in pursuit of game he is liable in trespass, although he did not himself go on the land . . . So also if he allow a dog to roam at large, knowing it to be addicted to destroying game . . ." And, further, we find this, with supporting note citations of cases, in Halsbury's, Vol. 15, page 226: ". . . or, again, if a person while hunting enters on the land of another without his consent, he commits an act of trespass . . . *Further, the entry need not be personal in order to be actionable. A man who himself does not enter, but invites or authorizes others to do so, is liable to an action for trespass . . . So, too, . . . the sending of a dog on to such land in pursuit of game . . .*" (Italics added.) See *Paul v. Summerhayes,* 4 Q. B. (Eng.) 9; *Beckwith v. Shordike,* 4

Bun. 2092, 98 Eng. Reprint, 91; *Baker v. Howard County Hunt,* 171 Md. 159, 188 A. 223, 107 A.L.R. 1312; Annotation: 107 A.L.R. 1323; Annotation: 21 Ann. Cas. 915. See also 2 Am. Jur., Animals, Sec. 105, p. 770.

We have not overlooked the following statement to which our attention has been directed in 24 Am. Jur., p. 377: "The trespass of a hunter in pursuit of game on another's premises may be made a crime, *but it has been held that such offense is not committed by the sending of a dog on the premises in search or pursuit of game."* (Italics added.) An examination of the two cases on which this text-statement is based discloses that in each instance the court was dealing with a criminal prosecution for alleged violation of a statute making it unlawful to hunt on the lands of another person. This latter portion of the text-statement, ". . . but it has been held that such offense is not committed by the sending of a dog on the premises in search or pursuit of game," is based solely upon the decision in *Pratt v. Martin* (1911), 2 K. B. (Eng.) 90, 21 Ann. Cas. 914, wherein the statute at hand made it a criminal offense for any person to commit a trespass by "entering or being upon" any land in search or pursuit of game. There, the facts were that the appellant hunter was lawfully on the lands of one Babb for the purpose of shooting game. Appellant with gun and dog came to a brook which divided Babb's land from that of another. He waved the dog across the brook into a spinney—a thicket—where the dog "put up a pheasant" which the appellant shot and killed, the bird dropping into the spinney. The dog retrieved the bird and carried it across the brook to the appellant. There was no evidence he was ever off the land of Babb. The lower court convicted. On appeal, the judgment below was reversed upon the theory that the provisions of the statute, as a criminal enactment, did not expressly cover the act of sending a dog on another person's land. The case decides nothing as bearing upon the question of civil trespass in respect to such conduct. It is manifest that the decision in *Pratt v. Martin* is not at variance with the well-established rule that one who intentionally sends his dog on another person's land in pursuit of game may be held civilly liable therefor on the theory of trespass.

This view is in accord with the decision of the English Court in *Paul v. Summerhayes, supra* (4 Q. B. 9), in construing the proviso in Section 35 of the English Game Act of 1831 (1 and 2 Wm. 4, c. 32; Halsbury's Statutes of England, 1929, Vol. 9, p. 1079). The Act makes certain trespasses in pursuit of game criminal offenses, whereas the proviso excepts fox hunting from the provisions of the Act in these words: ". . . that the aforesaid provisions against trespassers and persons found on any land shall not extend to any person hunting or coursing upon any lands with hounds or greyhounds, and being in fresh pursuit of any deer, hare, or fox already started upon any other land, . . ." In *Paul v. Summerhayes* the

appellants, who had been following a pack of foxhounds in the heat of chase, sought to justify entry on the lands of another by virtue of the foregoing proviso contained in the Game Act of 1831. However, it was held that the proviso was intended only to prevent the penal provisions of the Act from being applied against fox hunters, thus leaving the law of civil trespass unaffected by the Act. Said *Lord Coleridge, C. J.*—great nephew of Coleridge the poet—in delivering his opinion: "There is nothing, . . . in the Act to alter the common law with regard to trespass so far as concerns foxhunting." And *Meller, J.*, by way of concurrence had this to say: "In any case the exception in favour of foxhunting in the 35th Section could only apply to the special provisions of the Act for the protection of game, and could not affect the question whether a trespass could be justified at common law in the course of hunting a fox, . . ."

In recognition that the law of trespass as fixed by the principles of the common law affords no immunity to fox hunting as a sport, it has become the established custom in England for the master of the hunt to raise funds, by subscription of the members of the hunt, with which to pay farmers for damage done their poultry, fences, crops, etc., by the hunt. These funds are known as "Poultry," "Damage," and "Wire" Funds. See Brock, The A.B.C. of Fox-Hunting (American edition by Scribner's, 1936), p. 17.

To the established rule which holds one liable for trespass for sending his dog on another's land in pursuit of game we are advertent to this statement apparently *contra* appearing in Ingham, The Law of Animals (1900), Sec. 41, p. 121: "A person may justify trespass in following a fox with hounds over the grounds of another if he does no more than is necessary to kill the fox." This text-statement is based solely on the decision in *Gundry v. Feltham,* 1 T. R. 334, 99 Eng. Reprint 1125. That case was an action for trespass for entering the plaintiff's closes with horses and dogs and following a fox with hounds. It was decided by a three-member court composed of *Lord Mansfield, C. J., Willes* and *Buller, JJ.* The case was disposed of by this terse statement of *Mansfield, C. J.*: "By all the cases as far back as in the reign of Henry 8th, it is settled that a man may follow a fox into the grounds of another." However, *Buller, J.*, concurring, had this to say: "The question on this record is, whether the defendant be justified in following the fox at all over another man's grounds. The demurrer admits that which is averred in the plea, namely, that this was the only means of killing the fox. This case does not determine that a person may unnecessarily trample down another person's hedges, or maliciously ride over his grounds: if he do more than is absolutely necessary (to kill the fox), he cannot justify it; . . ." Thus the decision in *Gundry v. Feltham* was confined to narrow limits at the time of its rendition. It has been much criticized and has been treated by

the English courts as virtually unauthoritative since the notable decision in *Paul v. Summerhayes, supra* (4 Q. B. 9), decided in 1878. In the latter case, as we have seen, the appellants had been engaged in hunting with a pack of foxhounds. They sought to justify entry on the lands of another while in pursuit of a fox. They urged as authority in justification of their asserted right of entry (1) the proviso contained in Section 35 of the English Game Act of 1831 (1 and 2 Wm. 4, c. 32) which, as we have previously pointed out, was held inapplicable, and (2) the decision in *Gundry v. Feltham, supra,* decided in 1786. In holding that the decision in *Gundry v. Feltham* does not justify trespass in hunting on the lands of another with a pack of foxhounds, *Lord Coleridge, C. J.,* said in part:

"It was suggested that there is authority that foxhunting in the popular, well understood, sense of the term, that is, as a sport, can be carried on over the land of a person without his consent and against his will, and the case of *Gundry v. Feltham* was cited as authority for that proposition. I am of opinion that no such right as that claimed exists. The sport of foxhunting must be carried on in subordination to the ordinary rights of property. Questions such as the present fortunately do not often arise, because those who pursue the sport of foxhunting do so in a reasonable spirit, and only go upon the lands of those whose consent is expressly, or may be assumed to be tacitly, given. There is no principle of law that justifies trespassing over the lands of others for the purpose of foxhunting. The case of *Gundry v. Feltham* is distinguishable from the present case, and can be supported, if it is to be supported at all, only on the grounds suggested by *Lord Ellenborough* in the case of *Lord Essex v. Capel,* to which we have been referred. The demurrer admitted that what was done was the only means for destroying the fox, and *Buller, J.,* expressly puts his decision on that ground. The case was brought under the consideration of *Lord Ellenborough* in *Lord Essex v. Capel,* and he was distinctly of opinion that, where any other object was involved than that of the destruction of a noxious animal, an entry on the land of another, against his will, could not be justified. In the case of *Lord Essex v. Capel* it had been pleaded that the means adopted were the only means, and also that they were the ordinary and proper means of destroying the fox. But the evidence clearly shewed that in the case of foxhunting, as ordinarily pursued, the object of destroying the animal is only collateral. The interest and excitement of the chase is the main object. *Lord Ellenborough,* than whom there could be no higher authority on such a point, was of opinion that where this was the case, and where the real object was not the mere destruction of a noxious animal, a trespass could not be justified. If persons pursue the fox for the purpose of sport or diversion, they must do so subject to the ordinary rights of property. It would seem that there

may be some doubt as to the validity of the justification even where the only object is the destruction of a noxious animal. The idea that there was such a right as that of pursuing a fox on another's land appears to have been based on a mere dictum of *Brook, J.,* in the Year Book, 12 Hen. 8, p. 10. This dictum was not necessary for the decision of the case, for there the chasing of a fox was not in question, and the case went off on an entirely different point. It may well be doubted in my opinion whether, even if the case were one in which the destruction of a fox as a noxious animal was the sole object, there would be any justification. That question, however, does not, I think, arise here. It is enough to say that the case of *Gundry v. Feltham,* and the dictum of *Brook, J.,* in the Year Book, 12 Hen. 8, p. 10, do not at all conflict with the opinion expressed by *Lord Ellenborough* in *Lord Essex v. Capel,* which appears to me to be the true view of the law, viz., that a person has no right, in the pursuit of a fox as a sport, to come upon the land of another against his will. For these reasons our judgment must be for the respondent."

It may be conceded that since Samson, according to the folk tale of Biblical lore, tied the firebrands to the tails of 300 foxes and sent them into the grain fields of the Philistines (Judges 15 :4, 5) the fox has been looked upon by many persons as a noxious animal, to be exterminated. Nevertheless, to countless thousands of devotees of the chase the death of a fox, unless it be in front of hounds, is regarded as a social crime. We embrace the view of *Lords Ellenborough* and *Coleridge,* as stated by the latter in *Paul v. Summerhayes, supra,* that fox hunting as ordinarily pursued—certainly as shown by the record in this case—is pure sport to be followed in subordination to established property rights and subject to the principles governing the law of trespass. See also *Baker v. Howard County Hunt, supra;* 24 Am. Jur., Game and Game Laws, Sec. 8 ; 52 Am. Jur., Trespass, Sec. 12, p. 845.

In the case at hand the evidence is sufficient to justify the inference that the defendant, without permission of the plaintiff, on numerous occasions intentionally and for the purpose of sport sent his pack of dogs, or released them knowing they likely would go, on, over, and across the lands of the plaintiff in pursuit of foxes, whereby the plaintiff sustained substantial damage to his fences and other property. Without further elaboration it is enough to say that the evidence when tested by the applicable principles of law is sufficient to carry the case to the jury on the theory of trespass. The record discloses that the case was cast by the pleadings and developed by the evidence on that theory. The rule is that an appeal of necessity follows the theory of the trial. *Lyda v. Marion,* 239 N.C. 265, 79 S.E. 2d 726 ; *Parrish v. Bryant,* 237 N.C. 256, 74 S.E. 2d 726. Hence it is not necessary to treat of the statutes, G.S. 67-2 and 113-104, referred to in the briefs and discussed on the argument.

The judgment below is
Reversed.