810 A.2d 14

Charles MONTGOMERY, et al.,

v.

James R. REMSBURG, Sr.

No. 1524, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Nov. 1, 2002.

566

Philip J. McNutt (Hughes & Bentzen, PLLC, on the brief), Washington, DC, for appellants.

Paul Finamore (Brett A. Buckwalter and Niles, Barton & Wilmer, LLP, on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ADKINS, JOHN J. BISHOP, JR. (Retired, Specially Assigned) JJ.

ADKINS, Judge.

At 6:00 a.m. on November 28, just before daybreak on the opening day of the 1998 deer hunting season, Charles Montgomery waited quietly in the underbrush, near the northern boundary of the Montgomery family farm in Ijamsville. It was to be Charles's first deer hunt. He and his adult son Brian, an experienced hunter, had arrived in darkness to avoid disturbing deer that might come into their range.

As they awaited the official start of the hunting season—at 6:34 a.m., 30 minutes before sunrise—the Montgomerys were

surprised to hear other hunters approach the area from the neighboring property. One hunter climbed into a tree stand that had been located for many years on the Montgomery property, just next to where both Montgomerys remained hidden. At approximately 6:15, the Montgomerys decided to leave the area due to the newly arrived hunters. Before leaving, however, Charles Montgomery reached down to massage a leg cramp.

Immediately, a shot reported. A shotgun shell grazed Brian's neck, then pierced Charles' right arm and entered his side. The shooter was 27 year old James Remsburg, Jr. ("Remsburg Jr."), an experienced hunter. At the first sight of movement from the brush, he had taken aim and fired a single shot from his position in the tree stand.

When he realized his mistake, Remsburg Jr. called to his father, appellee James Remsburg, Sr. ("Remsburg Sr."), who left his post in a tree stand on the neighboring property. Along with others in his hunting party, Remsburg Sr. arrived to find Charles Montgomery bleeding profusely. Upon seeing the injured Montgomerys, Remsburg Sr. commented, "I guess that rules out telling Jamie to shoot at the first thing that moves."

As a result of Remsburg Jr.'s shot, Charles Montgomery has almost no use of his right arm and shoulder, and only limited use of his right hand. Charles, his wife Ruth Ellen, and Brian Montgomery, appellants, sued Remsburg Sr. and Remsburg Jr. for negligence and trespass. After they settled with Remsburg Jr., the Montgomerys continued to pursue their claims against Remsburg Sr.

The Circuit Court for Frederick County granted summary judgment in favor of Remsburg Sr., finding that (1) he could not be liable for negligence because he had no duty to warn Charles Montgomery that they would be hunting in the area that day, or to prevent his son from shooting the Montgomerys on their own property; and (2) he could not be liable for trespass because he was not hunting on the Montgomery

property. The Montgomerys contend that both rulings are erroneous.

This appeal presents an issue of first impression in Maryland, regarding the negligence liability of a hunter for his hunting companion's mistaken shooting of another hunter. Generally, hunters are not liable for the negligent and illegal acts of their hunting companions. In the circumstances presented here, however, we shall hold that there were factual disputes material to determining whether Remsburg Sr. owed the Montgomerys a special duty to take preventive measures, either by informing them that they intended to hunt in that area, or by giving Remsburg Jr. enough information to alert him to the possibility that other hunters might be present that morning. Because the trial court premised its grant of summary judgment solely on its "no duty" holding, we shall reverse the judgment on the negligence count, and remand for further proceedings.

Finding no error in the judgment on the trespass count, however, we shall affirm it.

## FACTS AND LEGAL PROCEEDINGS

Our review of the summary judgment record necessarily reflects the facts and inferences that are most favorable to the Montgomerys. *See Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 591, 578 A.2d 1202 (1990).

When Remsburg Jr. fired at the Montgomerys, he was standing and shooting on their property. In contrast, his father, Remsburg Sr., was not. Instead, he was positioned in a tree stand located on the adjacent Payne property, near its boundary with the Montgomery property, but about 250 to 400 yards from his son. The other members of the Remsburgs' hunting party also were on the Payne property.

On the morning of November 28, 1998, the Montgomerys and Remsburgs were not strangers. Remsburg Sr. had a long working relationship with Charles Montgomery's late father, James O. Montgomery, as well as years of hunting experience on the Montgomery property. James Montgomery allegedly

leased hunting rights to a number of different hunters, designating particular portions of the Montgomery property for each. In 1989, Remsburg Sr. and James Montgomery entered into a written lease giving Remsburg Sr. hunting rights for five years, for the annual sum of $500. Remsburg Sr. paid in work that he performed on the Montgomery property, which was credited against the rent.

According to the Montgomerys, when the Remsburgs' lease expired in 1994, Charles Montgomery had assumed his father's role as the decision maker regarding hunting rights. Charles verbally granted Remsburg Sr. hunting rights in each of the ensuing years, through 1997, and Remsburg Sr. continued to pay with his work.

During these years, Remsburg Sr. often brought his son and others to hunt on the Montgomery property. In fact, while Remsburg Jr. was still a minor, he and his father built the tree stand from which he eventually shot at the Montgomerys. This stand was located, at the suggestion of James Montgomery, near the northern boundary of the Montgomery property.

According to Charles Montgomery, however, as the 1998 deer hunting season approached, he had decided not to give Remsburg Sr. permission to hunt on the Montgomery property. He claimed that he made the decision, in part, because there had been reports of hunting altercations involving Remsburg Sr. Remsburg Sr., however, never spoke with Charles Montgomery about hunting rights for the 1998 deer season. Remsburg Sr. instead had entered into a written lease for hunting rights on the adjacent Payne property, which covered the 1998 deer season.

Whether, in addition to his right to hunt on the Payne property, Remsburg Sr. also had a right to hunt on the Montgomery property is disputed. In his answers to interrogatories,[1] Remsburg Jr. asserted a right to hunt from the

---

1. Remsburg Sr. attached these answers as an exhibit in support of his motion for summary judgment.

tree stand on the Montgomery property that was derived from his father's hunting rights under the 1989 lease, which, he alleged, had been renewed for another five years:

> *Mr. Remsburg was on the property in question with the permission of his father, James Remsburg, Sr. The [Montgomerys], either directly or through a predecessor, expressly consented to the presence of Mr. Remsburg on their property, for purposes of hunting, pursuant to the written Agreement of Lease, dated January 7, 1989, and subsequently renewed for an additional five year term* commencing January 7, 1994[.] (Emphasis added.)

The Montgomerys deny that the 1989 lease was renewed, and that Remsburg, Sr. ever paid any rent for such a renewal. In addition, they contend that, even if the lease had been renewed, it never covered the portion of their property where Remsburg Jr.'s tree stand is located. The 1989 lease limits hunting rights to a specific portion of the Montgomery property, which, it states, is identified in an exhibit incorporated into the lease. But that exhibit is missing, and the parties dispute which portion of the Montgomery property it referred to.

The Montgomerys assert that the 1989 lease did not give Remsburg Sr. hunting rights on the property located to the north of Ball Road, which bisects the Montgomery property.[2] In "commonsensical" support, they point out that there are three residences of various Montgomery family members north of Ball Road, as well as dairy livestock that would be disturbed by hunting activity.

Remsburg Sr. counters that the renewed 1989 lease gave them permission to hunt anywhere north of Ball Road. He points to Charles Montgomery's deposition testimony that he knew that Remsburg Sr. was hunting north of Ball Road on

---

2. According to Remsburg Jr.'s interrogatory answers, the "renewed" lease was a 1997 document that allowed Remsburg Sr. the right to hunt on portions of both the Payne and the Montgomery properties, and was entered into by Howard Payne, as landlord, and RFP, Inc., a corporation owned and controlled by Remsburg Sr., and Montgomery Farms, as tenants.

the Montgomery property, and that he was asserting to other hunters that he had a right to do so, until shortly before November 28, 1998. In additional "commonsensical" support, he notes the longstanding presence of the tree stand near the northern boundary of the property, and the fact that it was built where James Montgomery told them to put it.

The Montgomerys also point to other evidence that Remsburg Sr. appreciated the potential for trouble if his hunting party hunted out of the tree stand that morning. They point to evidence that earlier that fall, before this accident, another hunter to whom Charles had given hunting rights, reported to Charles Montgomery that he had encountered Remsburg Sr. on the Montgomery property while he was hunting, to argue that Remsburg Sr. knew he had not been given exclusive hunting rights for the 1998 deer season.

The Montgomerys also argue that Remsburg Sr. understood that the Montgomerys would not anticipate his hunting party's presence on opening day. They contend that on the evening of November 27, 1998, the night before deer season opened, Remsburg Sr. telephoned Charles Montgomery's house, but no one was home.[3] The Montgomerys claim that Remsburg Sr. was calling to ask for the permission to hunt that he knew he needed but did not have, or at least to advise Charles that his hunting party intended to hunt there under a claim of right.

The Montgomerys also alleged that there is evidence that the Remsburgs were competing for the first kill. They asserted that Remsburg Sr. hosted his hunting party overnight at a cabin that he built for hunting parties adjacent to the Payne

---

**3.** Although this incident was not alleged in the Montgomerys complaint or described in any of the deposition testimony, affidavits, or interrogatory answers that became part of the summary judgment record, counsel for both the Montgomerys and Remsburg Sr. agreed in the circuit court and in this Court that Remsburg Sr. made this call. We shall consider it to be part of the summary judgment record, because "[f]acts conceded or stipulated to be true facts" are properly considered in ruling on a motion for summary judgment. *See Vanhook v. Merchants Mut. Ins. Co.*, 22 Md.App. 22, 27, 321 A.2d 540 (1974).

property in preparation for opening day. They contended that there is deposition testimony from other members of the hunting party indicating that they discussed where members of the hunting party would be, including that Remsburg Jr. would be in the tree stand, and that there were "no trespassing" signs on the Montgomery property. In addition, in their discussion, they allegedly acknowledged that the hunter who shot the first deer of the season would have "bragging rights." According to the Montgomerys' proffer, there was deposition testimony that those bragging rights seemed very important to both of the Remsburgs. The Montgomerys also proffered that Remsburg Sr. never mentioned to the hunting party that he had failed to speak with the Montgomerys about hunting rights for the 1998 season.[4]

The circuit court held that summary judgment was appropriate on the Montgomerys' negligence claim, because

> in this particular case, [Remsburg Sr.'s] duty would have to arise out of a special relationship under Maryland law, and there just simply is no—it's not a factual matter, but there's not any relationship that's proffered or pled or presumed under any theory in Maryland law that would support a finding of liability there.

The court also held that summary judgment was appropriate on the Montgomerys' trespass and loss of consortium claims.

The Montgomerys appealed the judgments on these counts.[5]

## DISCUSSION

### Summary Judgment Standard Of Review

Our "review of the grant of summary judgment involves the determination of whether a dispute of material fact exists, and

---

4. The Montgomerys did not establish these allegations and proffers with any admissible evidence. We include them, however, because the trial court's grant of summary judgment was explicitly premised on its review of what was "proffered or pled or presumed[.]" *See infra* Section I.B.2.

5. They did not appeal summary judgments on other counts of their complaint for negligent entrustment and "joint enterprise."

'whether the trial court was legally correct.' " *Taylor v. NationsBank, N.A.,* 365 Md. 166, 174, 776 A.2d 645 (2001) (citations omitted). "In reviewing the grant of a summary judgment motion, we are concerned with whether a dispute of material fact exists and, if not, whether the movant is entitled to judgment as a matter of law." *Matthews v. Howell,* 359 Md. 152, 161, 753 A.2d 69 (2000). "If the case presents a clear legal issue, which does not require the trial court to resolve motive, intent, credibility, or disputed facts and inferences, then the court may determine liability as a matter of law on a motion for summary judgment. We review *de novo* the trial court's legal conclusion that a defendant is entitled to summary judgment." *Fagerhus v. Host Marriott Corp.,* 143 Md. App. 525, 535, 795 A.2d 221, *cert. denied,* 369 Md. 572, 801 A.2d 1032 (2002).

## I.

### Negligence

To establish negligence, a plaintiff must show "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Muthukumarana v. Montgomery County,* 370 Md. 447, 486, 805 A.2d 372 (2002)(quotation marks and citations omitted). Because summary judgment on the Montgomerys' negligence claim was premised solely on the circuit court's ruling that Remsburg Sr. did not have a duty to the Montgomerys, either to control the hunting conduct of his son or to warn the Montgomerys of his presence, our review focuses solely on the threshold element of duty.[6]

---

6. We do not address whether Remsburg Jr.'s negligent and illegal conduct was a "superceding" or "intervening" cause, because the circuit court did not rule on that question. *See* Md. Rule 8–131(a); *see also Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726 (2001)(in appeals from grants of summary judgment, Maryland appellate courts generally consider only those grounds cited by the trial courts as the

In reviewing the propriety of the summary judgment on the negligence count, we are faced with a series of related duty issues. In Part A of this section, we summarize the parties' arguments in light of the legal issues and the record. In Part B, we address two threshold procedural concerns raised in the parties' briefs: (1) whether the existence of a tort duty was a question of law for the court or a question of fact for the jury, and (2) whether summary judgment was appropriate due to the Montgomerys' failure to present any evidence in defense of the motion. In Part C, we review and apply lessons from the few reported Maryland cases involving hunting liability issues, and from a Wisconsin case that we find analogous to this one. In Part D, we consider and reject the Montgomerys' alternative arguments in favor of establishing a broader "duty *per se* " on Remsburg Sr.

## A.

### The Parties' Duty Arguments

"[N]egligence is a breach of duty owed to one, and absent that duty, there can be no negligence." *Ashburn v. Anne Arundel County,* 306 Md. 617, 627, 510 A.2d 1078 (1986). "[T]here are a number of variables to be considered in determining if a duty exists to another," including

*"the foreseeability of harm to the plaintiff,* the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the

---

basis for its ruling). We note, however, that this is not a defense to the duty element of negligence, but rather an entirely separate defense to the causation element. *See, e.g., Jubb v. Ford,* 221 Md. 507, 513–14, 157 A.2d 422 (1960)(whether other drivers also were negligent and whether their negligence was a concurring cause of a three vehicle traffic accident were jury questions relating to the causation element of negligence).

For similar reasons, we do not address whether, in the particular circumstances presented by this case, the Montgomerys were contributorily negligent in failing to alert the Remsburgs to their presence. Although the Remsburgs raised this issue in their answer, the trial court did not reach it in ruling on the motion for summary judgment. *See* Md. Rule 8–131(a); *Lovelace,* 366 Md. at 695, 785 A.2d 726.

injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved."

*Id.* at 627, 510 A.2d 1078 (quoting *Tarasoff v. Regents of Univ. of Cal.,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 342 (1976))(emphasis added).

■ "Inherent . . . in the concept of duty is the concept of a relationship between the parties out of which the duty arises." *Rosenblatt v. Exxon Co., U.S.A.,* 335 Md. 58, 77, 642 A.2d 180 (1994). The reason for this limitation on negligence liability is that " '[t]here is normally much less reason to anticipate acts on the part of others which are . . . merely negligent, and this all the more true where, as is usually the case, such acts are criminal.' " *Valentine v. On Target, Inc.,* 353 Md. 544, 552, 727 A.2d 947 (1999) (citation omitted).

■ "The general rule is . . . that a private person is under no special duty to protect another from criminal acts by a third person, in the absence of statutes, or of a special relationship." *Scott v. Watson,* 278 Md. 160, 166, 359 A.2d 548 (1976).

"There are, however, . . . situations, in which either a special responsibility resting upon the defendant for the protection of the plaintiff, or an especial temptation and opportunity for criminal misconduct brought about by the defendant, will call upon him to take precautions against it.

*See Valentine,* 353 Md. at 552–53, 727 A.2d 947 (citation omitted).

The Montgomerys' negligence claim against Remsburg Sr. rests on their contention that he had a special duty to take measures that would have prevented this accidental shooting. In effect, they argue, Remsburg Sr. was negligent in failing either to control his son or to warn them of his presence. In this respect, the Montgomerys' duty argument against Remsburg Sr. is inextricably tied to the negligent and illegal

conduct of Remsburg Jr. To understand the Montgomerys' claim against Remsburg Sr., then, we must first review their complaints against Remsburg Jr.

## 1.

### The Illegal Shot

The Montgomerys point out that Remsburg Jr.'s shot was illegal in three critical respects.

First, **Remsburg Jr. did not have a hunting license.**[7] Maryland law prohibits a person from hunting or attempting to hunt "game . . . mammals in the State without first having procured either a resident or nonresident hunter's license." Md.Code (1974, 2000 Repl.Vol., 2001 Cum.Supp.), § 10–301(a) of the Natural Resources Article ("NR"). To hunt deer, a hunter also must "obtain the appropriate individual hunting stamp."[8] NR § 10–308(a).

To qualify for a hunting license, hunters must "produc[e] a certificate of competency" in firearms and hunting safety. See NR § 10–301.1(a)(1)(ii). The Department of Natural Resources will issue a certificate of competency and safety only to hunters who successfully complete a prescribed course of instruction. See NR § 10–301.1(b). To obtain a license, each hunter also must sign a statement that says: "I understand that this hunting license does not of itself permit me to hunt on private property, and if I do so without permission of the owner, I may be subject to a fine." NR § 10–301(e). While hunting, each hunter must have his or her license, and must

---

7. This was admitted in the course of summary judgment proceedings. The complaint alleged that Remsburg Jr. apparently was criminally charged with negligent hunting, hunting without a permit, and hunting at night, and that he pleaded guilty to negligent hunting and hunting at night.

8. Under Maryland law, "[t]here are . . . 3 seasons to hunt deer," based on different weapons: bow hunting, firearms, and muzzle loader. See Md.Code (1974, 2000 Repl.Vol., 2001 Cum.Supp.), § 10–415(a) of the Natural Resources Article.

show it upon demand of a Natural Resources police officer or the owner of the property. *See* NR § 10–306; § 10–411(c).

Second, the Montgomerys claim, ***Remsburg Jr. was hunting on their property without their permission or knowledge.*** Under Maryland law, hunters in Frederick County "may not enter or trespass upon land owned by another person for the purpose of hunting deer on the land with gun [or rifle] ... without first securing the written permission of the landowner[.]" NR § 10–411(c). Doing so is a misdemeanor criminal offense. *See* NR § 10–411(d).

In his deposition, Remsburg Jr. testified that he did not know on whose property the tree stand was located. He claimed, however, that the tree stand was situated in that position on the advice of James O. Montgomery, and that he and others built it more than five years before the incident. When asked why he was hunting there that morning, Remsburg Jr. claimed that he had a right to "hunt out of [his] stand," as he had been doing "for 15 years."

Since Remsburg Jr. asserted in his answers to interrogatories that his hunting rights derived solely from his father's hunting rights, we assume for purposes of this appeal that he was hunting illegally on the Montgomerys' property and that Remsburg Sr. caused him to do so by failing to advise him that he did not have the Montgomerys' permission. We also assume that Remsburg Sr. knew that his son was hunting illegally on the Montgomery property, and that Remsburg Jr. was doing so under the mistaken belief that the Montgomerys had given such permission.

Third and last, ***Remsburg Jr. fired before the season officially started.*** Maryland law prohibits nighttime hunting of deer, which is defined as "the time beginning one-half hour after sunset and ending one-half hour before sunrise the following day, as published in the Department's hunter's guide[.]" *See* NR § 10–101(*l*), § 10–410(b). According to that publication, the official start of the 1998 season for firearm hunting of deer was 6:34 a.m. on November 28. Remsburg Jr. admits that he fired too early, at approximately

6:15 a.m. Thus, it is undisputed that his shot was too early to be legal.

## 2.

## Special Duty

Because the shot that Remsburg Jr. fired at the Montgomerys was at least doubly, and possibly triply, illegal, Remsburg Sr. had no duty to protect the Montgomerys from Remsburg Jr. unless he had a special duty to them. "[S]pecial duties 'arise out of special relations between the parties, which create a special responsibility, and take the case out of the general rule' " limiting negligence liability to crime victims. *Fried v. Archer*, 139 Md.App. 229, 246, 775 A.2d 430 (2001), *aff'd sub nom. Muthukumarana v. Montgomery County*, 370 Md. 447, 805 A.2d 372 (2002)(quoting *Restatement (Second) of Torts* § 314A cmt. b (1965)).

A special duty "may be established in a number of ways: (1) by statute or rule, (2) by contractual or other private relationship, or (3) indirectly or impliedly by virtue of the relationship between the tortfeasor and a third party[.]" *Bobo v. State*, 346 Md. 706, 715, 697 A.2d 1371 (1997) (citations omitted). Thus, absent a statute or one of these special relationships, there is no private duty to control the illegal or negligent conduct of a third person so as to prevent him from causing physical harm to another. *See Furr v. Spring Grove State Hosp.*, 53 Md.App. 474, 482, 488–89, 454 A.2d 414 (1983)(adopting *Restatement* § 315).

The Montgomerys assert that all three of the potential sources of special duty were present in this case. Specifically, they claim that Remsburg Sr. had a special duty based on (1) Maryland's hunting laws, (2) the long course of contractual dealing between Remsburg Sr. and the Montgomerys, and (3) Remsburg Sr.'s leadership of the hunting party. With respect to the latter two "relationship" bases for a special duty, they argue that

the clear inference from the undisputed facts and the disputed facts is that [Remsburg Sr.] has a sufficient relation-

ship to [the Montgomerys] and control over the hunting conducted by his son to create a duty to the [Montgomerys] to warn and to take reasonable actions to assure their safety from hunting accidents, such as the subject one.

## B.

### Threshold Concerns

Before addressing the parties' substantive arguments regarding Remsburg Sr.'s duty to the Montgomerys, we must resolve two threshold concerns raised by the parties.

### 1.

### The Duty Decision

The Montgomerys argue that the circuit court erred "in determining that the existence of a special relationship [creating a tort duty] was an issue of law," because that issue "is a matter of factual determination to be decided by the trier of fact[.]" They assert that "if there is any set of facts on which the 'special relationship' could be found by a reasonable jury, the issue should have been held over for trial." Remsburg Sr. responds that "[t]his statement of the law is incorrect," because "the existence of a special relationship is a question of law that the court takes into consideration when determining if a duty exists."

"A tort duty is 'an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.'" *Eisel v. Bd. of Educ. of Montgomery County*, 324 Md. 376, 385–86, 597 A.2d 447 (1991) (citations omitted). When there is no dispute regarding the facts material to determining whether the defendant had a special duty arising from a special relationship with the plaintiff, and no dispute regarding the inferences from those facts, the existence of a special duty in tort is purely a question of law for the court to decide. *See Muthukumarana*, 370 Md. at 472–76, 805 A.2d 372; *Valentine*, 353 Md. at 549, 727 A.2d 947; *Bobo*, 346 Md. at 716, 697 A.2d 1371. Thus, the question of

whether Remsburg Sr. had a duty to the Montgomerys ultimately is one that the court must decide as a matter of law.

Nevertheless, the court may not usurp the role of the jury in the course of determining whether a special duty exists. As we recently explained, if there are any disputed facts or inferences, and if any of those disputed facts or inferences are material to determining whether a special relationship exists, then those disputes must be resolved before the court can decide whether there is a special duty.

> "[T]he existence of duty may depend on preliminary questions that must be determined by the fact finder." ... "It is for the court to determine, as a matter of law, what characteristics must be present for a relationship to give rise to a duty the breach of which may result in tort liability. It is for the jury to determine whether the facts in evidence establish the elements of that relationship. Thus, the jury decides the question of duty only in the sense that it determines whether the proofs establish the elements of a relationship which the court has already concluded give rise to a duty as a matter of law."

*Sterling v. Johns Hopkins Hosp.*, 145 Md.App. 161, 171 n. 7, 802 A.2d 440, 445 n. 7 (2002) (citations omitted). *See also Muthukumarana*, 370 Md. at 475–76, 805 A.2d 372 ("because there was no dispute as to the material facts ..., it was proper for the ... courts to determine, as a matter of law, whether a special relationship existed"); *Williams v. City of Baltimore*, 359 Md. 101, 150, 753 A.2d 41 (2000)("when a dispute of material fact exists, ... the determination as to whether a special relationship exists lies with the trier of fact").

Here, the trial court ruled that Remsburg Sr. had no duty to the Montgomerys because there was "not any relationship ... that would support a finding of liability[.]" The court therefore applied the correct "special relationship" standard for determining Remsburg Sr.'s duty. As we see it, the problem with the court's ruling is that it resolved disputed facts in doing so. We discuss that error in Section I.C.

## 2.

## Adequacy Of The Montgomerys' Summary Judgment Defense

Remsburg Sr. urges us to affirm the circuit court's summary judgment because the Montgomerys failed to adequately defend his motion. He points out that they simply rested on the allegations and argument in their complaint and pleadings, without citing to admissible evidence to support their contention that a dispute of material fact existed.

Although we agree that the Montgomerys did not proffer an affidavit or any other admissible evidence in defense of the motion, that failure alone does not justify the grant of summary judgment. Non-compliance with summary judgment rules does not require judgment in favor of a party who clearly is not entitled to prevail as a matter of law. *See Dudley v. Montgomery Ward & Co.*, 255 Md. 247, 254, 257 A.2d 437 (1969). As the party seeking summary judgment, Remsburg Sr. had a threshold burden of establishing the facts necessary for the court to determine that he did not have a special duty to the Montgomerys. *See, e.g., Sterling*, 145 Md.App. at 168, 802 A.2d 440 ("The moving party bears the burden of establishing the absence of a genuine issue of material fact"). The circuit court's observation that "there's not any relationship that's proffered or pled or presumed under any theory in Maryland law that would support a finding of liability" reflected its determination that Remsburg Sr. had satisfied that burden, even if every allegation made by the Montgomerys in their pleadings and proffers, and every presumption of law were to be construed in their favor.

It is this rationale that we must review. Our task on appeal is to consider the same material that the circuit court considered, and to decide the same legal issue that the circuit court decided. *See Heat & Power*, 320 Md. at 591–92, 578 A.2d 1202. Accordingly, we, too, examine everything that was "proffered or pled or presumed" by any party to determine whether the circuit court's ruling was "legally correct." *See id.* at 592, 578 A.2d 1202.

As we explain in Section I.C, we conclude that it was not, primarily because there are disputed facts and inferences raised by the deposition testimony, interrogatory answers, admissions, and stipulations offered by Remsburg Sr. himself. Thus, the summary judgment record was not sufficient to establish that Remsburg Sr. was entitled to judgment as a matter of law, and the Montgomerys were entitled to rely on the inadequacy of that record as grounds for their defense of his motion.

## C.

### Remsburg Sr.'s Duty To The Montgomerys

### 1.

### Lessons From Maryland Hunting Cases

Although neither the parties nor the circuit court reviewed Maryland hunting cases, we find some helpful, although not dispositive, lessons in them. Our research revealed three reported hunting liability cases in Maryland, the most recent of which involved an accidental shooting.

In *Wood v. Stotski*, 148 Md. 508, 129 A. 646 (1925), a landowner ordered the plaintiff's dogs to be shot and killed after the plaintiff and others trespassed on his property at night, in pursuit of a raccoon. The plaintiff professed that they were "merely exercising the dogs without any intention of killing or capturing the raccoon pursued," given that "the lawful season for such hunting had not yet begun[.]" *Id.* at 510, 129 A. 646. There was, however, a history of illegal hunting disputes between the landowner and the plaintiff. That night, the landowner and his son ordered the plaintiff's hunting party to leave the property, "and they, in fear, put their lights out and hid in the swamp[.]" *Id.* When the landowner discovered that the dogs were still on his property, he instructed his son to shoot them.

The trial court directed a verdict for the landowner, ruling that the shooting was a justifiable exercise of reasonable force. The Court of Appeals reversed, "conclud[ing] that the question

should have been left to the jury for their decision." *Id.* at 509, 129 A. 646. The Court reasoned that, although "[a] landowner is not required to provide a hunting ground . . . for his neighbor and the neighbor's dogs," the question of whether this was a justified shooting was a matter for the jury because the reasonableness of the landowner's actions could not be determined as a matter of law. *See id.* at 510–11, 129 A. 646.

In *Baker v. Howard County Hunt,* 171 Md. 159, 188 A. 223 (1936), a property owner sued the local fox hunting club, seeking to enjoin the repeated trespasses of its huntsman and his hounds. The Court of Appeals, noting that "the rights of the fox-hunter are subordinate to the rights of the landowner," held that the trial court erred in denying the injunction because the club and the huntsman were "under a duty to so control the hounds as to prevent further trespass." *See id.* at 168, 172, 188 A. 223. It reasoned that, just as "if the hunter himself goes on the lands of another against the owner's will, he is a trespasser," so too, if the hunter knowingly "send[s] dogs on the land of another in pursuit of game . . . or hunt[s] them in a neighborhood when [he had] reason to know that the chase will probably take them over land on which they have no right to go," the hunter may be enjoined from future trespass. *See id.* at 168–69, 188 A. 223.

In *Hooper v. Mougin,* 263 Md. 630, 284 A.2d 236 (1971), a hunter who negligently shot in the direction of his hunting party challenged a substantial jury verdict in favor of his hunting guide, who lost an eye in the accident. The Court of Appeals held that the guide had not, as a matter of law, assumed the risk of being shot, merely because he was engaged in a dangerous occupation or activity. *See id.* at 635, 284 A.2d 236. To the contrary, the trial court properly had instructed the jury that the guide had assumed "only normal and average risks," rather than "all risks." *See id.* at 638, 284 A.2d 236. The Court explained that persons engaged in dangerous occupations or activities " 'assume[ ] only those risks which might reasonably be expected to exist, and, if by some action of the defendant, an *unusual* danger arises, that is not so assumed.' " *Id.* (quoting *Bull Steamship Lines v.*

*Fisher*, 196 Md. 519, 526, 77 A.2d 142 (1950))(emphasis added in *Hooper*). Following a Minnesota case involving a similar hunting accident, the Court concluded that " '[h]unting does not inherently impute knowledge of any and all momentary or specific acts of negligence of a hunting partner.' " *Id.* at 638–39, 284 A.2d 236 (quoting *Ganser v. Erickson*, 279 Minn. 235, 156 N.W.2d 224, 226 (1968)). Thus, although hunting is " 'risky and attended with almost self-defining risk,' " hunters do " 'not necessarily assume the risk of being shot ... *merely* by going hunting[.]' " *Id.* at 639, 284 A.2d 236 (quoting *Ganser*).

Of these three cases, *Baker* and *Wood* materially differ from this case because neither involved an accidental shooting. Only *Hooper* addressed a hunter's negligence liability for a hunting accident. But *Hooper* also differs from this case because it involved the liability of the shooter, rather than the liability of another member of the shooter's hunting party. Thus, none of these three cases directly addressed the negligence liability of a hunter for the negligent and illegal shot of a hunting companion.

 Despite these distinctions, all three cases offer some instructive lessons. From all three, we learn that hunters owe a duty of care to the people and property they encounter while they are on the hunt. From *Hooper*, we learn that hunters are held to the well-established standard of objectively reasonable conduct, and that the issue of whether a hunter acted reasonably is a jury question when there are factual disputes bearing on that determination. From *Baker*, we learn that in some circumstances a defendant may be held responsible for harm inflicted by associates hunting under the defendant's name, *i.e.*, the hunt club was enjoined due to the property damages caused by its huntsman and his hounds. From *Wood*, we learn that the question of whether a particular shot was reasonable may be a matter for the jury, *i.e.*, whether the landowner could be held liable for instructing his son to shoot the dogs was a jury question.

Nevertheless, these lessons do not provide an adequate legal foundation for determining Remsburg Sr.'s liability in this case. Looking for a comparable case addressing the liability of one member of a hunting party for the negligent and illegal shot of another member, we discovered an analogous case outside Maryland. We turn to it for guidance.

### 2.

### Lessons From Wisconsin

In *Kramschuster v. Shawn E.*, 211 Wis.2d 699, 565 N.W.2d 581 (App.1997), the Court of Appeals of Wisconsin considered the grant of summary judgment in favor of Donald McClelland, the head of a deer hunting party. McClelland planned a hunting trip for the opening day of deer hunting season. He invited two minors, including 15 year old Shawn E., a tenth grader who had completed hunter education and firearm safety courses, had hunted "numerous times" (including by himself), and was licensed and legally "permitted to hunt without adult supervision." *Id.* at 583.

After spending the night at a cabin on property that McClelland owned, the three set out in the dark for the adjacent property. Although McClelland did not own or lease that property, they planned to hunt there that morning. When they arrived, "McClelland told Shawn where to sit, where the McClellands would be located and some generalized suggestions as to Shawn's field of fire so as to drive the deer toward the McClellands in the event Shawn missed the deer." *Id.* McClelland, however, did not tell Shawn about a nearby path "that was used by other hunters seeking access to nearby hunting areas," nor did he tell Shawn "to wait for the official start of hunting season in that area or for sufficient light before firing his gun." *Id.*

"While it was still dark and before the official start of the hunting season, Shawn observed what he believed to be a group of deer .... but was in fact a group of hunters, which included Allen Kramschuster, walking up the trail." *Id.* Shawn "fired his weapon," killing Kramschuster. *Id.* His

widow sued Shawn, his insurer, and McClelland. The trial court granted summary judgment in favor of McClelland, on the ground that he had no duty to Kramschuster, and that there was no evidence of McClelland's causal negligence.

On appeal, Mrs. Kramschuster argued that (1) McClelland had a duty to instruct Shawn about hunting rules against shooting too early and without adequate visibility; and (2) "McClelland had a duty to supervise Shawn as a member of his hunting party." *Id.* at 585. She also suggested "that McClelland actively misled Shawn into shooting before the official start of the season and induced the erroneous belief that no one else would be in the area." *Id.* Rejecting all these arguments, the Wisconsin appellate court affirmed the judgment because "there was no duty owed by McClelland[.]" *Id.* at 583.

The court first considered "whether an adult hunter, who is not the child's parent, has a duty to supervise or instruct a fifteen-year-old certified and experienced hunter who is a member of the adult's hunting party." *Id.* at 584. It "answer[ed] that question under the facts of [that] case in the negative because ... it was not reasonably foreseeable that Shawn would flagrantly violate hunting rules he knew and understood." [9] *Id.*

---

**9.** The *Kramschuster* Court applied what it acknowledged was Wisconsin's minority view of tort duty based on foreseeability alone.

> Wisconsin's law of duty follows the minority view in the well-known case of *Palsgraf v. Long Island R.R. Co.*, [248 N.Y. 339, 162 N.E. 99 (1928)].... "The duty of any person is the obligation of due care to refrain from any act which will cause foreseeable harm to others even though the nature of that harm and the identity of the harmed person ... is unknown at the time of the act." ... A person only has a duty to ... act when it is foreseeable a harm would otherwise result. Foreseeability is not all inclusive but is tempered by what can reasonably be foreseen by the defendant.

*Kramschuster v. Shawn E.*, 211 Wis.2d 699, 565 N.W.2d 581, 583–84 (App.1997) (citations omitted). Maryland does not determine duty based solely on foreseeability. *See, e.g., Ashburn v. Anne Arundel County*, 306 Md. 617, 628, 510 A.2d 1078 (1986)("The fact that a result may be foreseeable does not itself impose a duty in negligence terms").

The *Kramschuster* Court specifically rejected the contention that McClelland had a duty, as the head of a hunting party, to ensure that an independent member of his party complied with fundamental hunting safety rules, by giving pre-hunt instructions.

> In retrospect, admonitions about adequate light and adequate field of vision before shooting may have averted this tragedy. At the time in question, there were a myriad of other hunting safety rules that may also have come into play and could, under different facts, just as easily have supported allegations of negligence against McClelland.... The failure to reiterate basic hunting rules to an independent member of the hunting party does not create a foreseeably unreasonable risk of injury to another person under these facts. Because of his experience in hunting and education in firearm safety and because there was no understanding either expressed or implied that McClelland would instruct Shawn in regard to hunting safety regulations, we conclude that McClelland had no duty to so instruct prior to the commencement of this hunt.

*Id.* at 584–85.

Similarly, the Wisconsin court also rejected the contention that McClelland had a duty to supervise Shawn during the hunt.

> We see no basis for such a claim. Shawn was a member of a hunting party consisting of three persons, one of whom was a twelve-year-old child. While the three were members of the same hunting party, McClelland accepted no responsibility of supervision by merely inviting David and Shawn to join them in the hunt. He was like any experienced hunter responsible for his own conduct without any duty of supervision being imposed by law or by the facts of this case upon any other member of the hunting party. While the law may imply a duty of supervision when the experience, age or other factors of a child's engaging in a hunt may suggest such supervision is necessary, those are not the facts of the case before us. We conclude that McClelland had no special duties of supervision, control or responsibility

over Shawn because of Shawn's experience and certification as a hunter authorized by law to engage in the hunting of deer.

*Id.* at 585.

Addressing Mrs. Kramschuster's alternative suggestions that McClelland might be liable for "actively [misleading] Shawn into shooting before the official start of the season" or "induc[ing] the erroneous belief that no one else would be in the area," the Wisconsin Court of Appeals concluded that "these inferences, if proven, would state a claim for negligence[.]" *Id.* It therefore proceeded to examine the pleadings and record evidence to determine whether summary judgment was warranted on such claims. *See id.*

The court found

that the claims of active negligence by McClelland [were] not supported by the evidence of record. The record does not show that McClelland ever told Shawn that there would be no other humans in the area. Even if McClelland had made such a statement, Shawn had seen other people in the area and was aware that the trail could be utilized by other hunters. Therefore, Shawn could not have reasonably relied on any statement that no humans would be in the area.

The evidence also does not support any suggestion that McClelland communicated to Shawn a time to start shooting. Shawn had independently, although incorrectly, concluded what time the hunting season began in his area and admittedly shot before the start of the season, as he believed it to be. Therefore, there is no evidence that McClelland actively induced Shawn to fire before it was safe.

*Id.*

### 3.

### Applying *Kramschuster's* Lessons

We find *Kramschuster* persuasive, though we reach a different result given the factual differences in this case. Indeed, we shall apply the *Kramschuster* Court's general principles

limiting the liability of hunters for the negligent and illegal acts of their hunting companions, but ultimately conclude that this case illustrates when the decision as to whether a hunter has stepped outside the safe harbor of those limitations cannot be resolved as a matter of law.

First, we agree with the Wisconsin court that the organizer and leader of a hunting party does not assume, as a matter of law by virtue of that role, a duty to instruct all the independent hunters in the party about basic hunting safety rules, including when shooting legally may begin. Second, we agree that the head of a hunting party generally does not have a duty to supervise independent members of the party during the hunt. Third, we agree that a member of the hunting party who does nothing to actively encourage another to take an illegal or negligent shot has no duty to the person hit by that shot. Fourth, we agree that a member of a hunting party who does not induce another hunter to reasonably believe that no other hunters will be in the vicinity has no duty to the shooting victim.

Nevertheless, we conclude in this case that there were disputed facts and inferences that, when resolved in favor of the Montgomerys, should have prevented the court from entering summary judgment in favor of Remsburg Sr. We explain, using these duty limitations as the basis of our discussion.

### a.

### Duty Of Head Of Hunting Party

### To Instruct

The Montgomerys argue that, as the head of the hunting party, Remsburg Sr. had a duty to protect them by controlling Remsburg Jr.'s illegally early hunting on the Montgomerys' property. We disagree.

Remsburg Jr., like Shawn in *Kramschuster*, was an independent and experienced hunter, in that he was an adult with many hunting trips in his past. But unlike Shawn, Remsburg

Jr. was not a licensed hunter, and there was no evidence in the summary judgment record that he had taken any of the hunting and firearm safety courses required to obtain a Maryland hunting license.[10]

The *Kramschuster* Court explicitly based its presumption that Shawn knew both hunting safety laws against hunting at nighttime and hunting safety practices against shooting in inadequate light conditions, on the fact that he was a licensed hunter who had completed all the hunting and firearm safety training necessary to obtain that hunting license. *See id.* at 584–85. Here, absent any evidence that Remsburg Jr. had been certified and trained in hunting and firearms safety, we cannot make the same presumption that he knew that he could not and should not shoot before 6:34 a.m. that morning.

By itself, however, the blank record regarding Remsburg Jr.'s certification and training is not sufficient to prevent summary judgment, when there is evidence that Remsburg Jr. was an experienced hunter, with approximately 550 hunting trips. Indeed, the Montgomerys agreed that Remsburg Jr. is an experienced hunter. Like Shawn in Kramschuster, then, Remsburg Jr. was an undisputedly seasoned hunter who hunted without supervision. In these circumstances, Remsburg Sr.'s status as putative head of the hunting party could not create a duty to instruct Remsburg Jr. regarding "legal hunting time." [11]

### b.

### Duty To Use Due Care In Dealing With Hunting Companion

We reach a different conclusion on the question of whether there was enough evidence to raise an inference that Rems-

---

**10.** We do not address or decide whether, under Maryland law, a hunter with the same qualifications as 15–year–old Shawn could be considered an "independent" hunter whom the head of a hunting party would have no duty to instruct or supervise.

**11.** In light of this record, we address neither the question of whether Remsburg Sr. could be found to be the head of the hunting party, nor what, if any, duties that status might entail.

burg Sr. breached a duty of care to the Montgomerys, by inducing Remsburg Jr. to believe that no other hunters would be in the vicinity of the tree stand. We explain.

All hunters have a duty to use reasonable care toward owners and users of the land where they hunt. *See Kramschuster*, 565 N.W.2d at 583–85. As a general principle, then, a hunter has a duty to refrain from "actively negligent" conduct that foreseeably endangers owners and users of the land where they are hunting. For example, as the *Kramschuster* Court recognized, hunters clearly have a duty to refrain from instructing, assisting, or urging other members of their hunting party to fire illegal or obviously negligent shots. If one hunter commands or explicitly encourages a hunting companion to fire an illegally early shot into the darkness, that lack of due care cannot be excused merely because the hunting companion actually pulled the trigger. *Cf., e.g., Wood*, 148 Md. at 511–12, 129 A. 646 (whether landowner who instructed son to shoot hunting dogs was negligent was a jury question).

In this case, we do not see sufficient evidence to support the conclusion that Remsburg Sr. was "actively negligent" in encouraging his son to take an illegally early shot at the Montgomerys. As we have discussed, there was some evidence that Remsburg Sr. had advised his son to "shoot at the first thing that moves," perhaps without regard to the legality or safety of the shot. That evidence, however, does not establish the type of direct instruction to shoot that we see in *Wood*.

There was, however, evidence to support an inference that Remsburg Sr. was actively negligent in inducing his son to believe that there would be no other hunters in the vicinity of the tree stand that morning. A jury reasonably could conclude that Remsburg Jr. was hunting from the tree stand under the mistaken belief that the Montgomerys would not be hunting in that area, because they had granted his father permission to hunt in that area. In addition, a jury could conclude that Remsburg Sr. knew that his son did not expect anyone else to be near the tree stand, even though Remsburg

Sr. knew from his recent encounter with another hunter on the Montgomery property that someone else might be hunting there that morning. By giving his son "permission" to use the tree stand, without telling him that it was on the Montgomerys' property, without warning him that the Montgomerys had not given him the right to hunt on their property, without warning him that the Montgomerys were not aware of their plans to do so, and without warning him that the Montgomerys had granted hunting rights to others, Remsburg Sr. negligently may have induced his son to believe that no other hunters would be in the vicinity of the tree stand as the deer season opened.

For this reason, the principles generally limiting a hunter's liability for the negligence of a hunting companion did not warrant summary judgment in favor of Remsburg Sr. Our conclusion is consistent with *Wood* and *Hooper*, in that it preserves the resolution of factual disputes for the jury, while ensuring that hunters generally may be held liable for damages inflicted by their hunting companions only when their own acts or omissions bring about that companion's injurious conduct.

Our conclusion, however, does not give the Montgomerys the complete appellate victory that they seek. The Montgomerys ask us to rule that Remsburg Sr. had a duty to them as a matter of law. In other words, they advance a *"per se* duty" rationale for reversing the judgment. Next, we explain why we reject that argument.

## D.

### Hunters Do Not Have A Per Se Duty To Owners And Users

The Montgomerys argue that there are a number of reasons that Remsburg Sr. had a *"per se* duty" to them, regardless of any factual disputes presented by this record. We address and reject each rationale in turn.

## 1.

### Foreseeability

■■■ The Montgomerys assert that a special duty to prevent illegal conduct by a hunting companion should be presumed because harm from a hunter's negligence is highly foreseeable. But the Court of Appeals has held that foreseeability, by itself, does not create a special duty.

> *"[F]oreseeability" must not be confused with "duty." The fact that a result may be foreseeable does not itself impose a duty in negligence terms.* This principle is apparent in the acceptance by most jurisdictions and by this Court of the general rule that there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a "special relationship" exists either between the actor and the third person or between the actor and the person injured.

*Ashburn,* 306 Md. at 628, 510 A.2d 1078 (emphasis added). *See also Valentine,* 353 Md. at 551, 727 A.2d 947 ("not all foreseeable harm gives rise to a duty"); *Fried,* 139 Md.App. at 254, 775 A.2d 430, *aff'd sub nom. Muthukumarana v. Montgomery County,* 370 Md. 447, 805 A.2d 372 ("The *Ashburn* Court made it clear that foreseeability alone cannot establish a special duty in tort").[12]

## 2.

### "High Risk" Or Dangerous Conduct

■■■ The Montgomerys also contend that a special duty should be presumed because of the inherently "high risk"

---

12. We are not persuaded by the Montgomerys' argument that *Jubb v. Ford,* 221 Md. 507, 157 A.2d 422 (1960), requires a different answer in this case. That case involved a traffic accident in which none of the parties had a special duty or special relationship. Moreover, the language that the Montgomerys rely on in their duty argument did not address whether there was a duty, but rather, whether there was a defense of "concurring cause." Instead, we find the standards for determining special duty articulated in cases such as *Muthukumarana, Valentine,* and *Williams* apposite in this special duty case.

nature of a hunter's interaction with landowners and users. Again, we do not agree that, by itself, the dangerous nature of hunting merits the imposition of a special duty on all hunters to control the conduct of their hunting companions.

As the Court of Appeals has recognized, " '[h]unting does not inherently impute knowledge of any and all momentary or specific acts of negligence of a hunting partner.' " *Hooper,* 263 Md. at 638–39, 284 A.2d 236 (citation omitted). Analogous "danger" arguments also were rejected in *Valentine* and *Fried.* In *Valentine,* the Court of Appeals "declined to use the special duty rule to expand the tort liability of gun store owners," explaining that "a private defendant does not have a private duty of care solely because he is engaged in activity that presents a substantial, but generalized risk of harm." *Fried,* 139 Md.App. at 255, 775 A.2d 430. In *Fried,* we declined to expand the tort liability of emergency dispatchers solely because their work inherently involves a "high risk" of substantial harm from a dispatcher's negligence. *See id.* ("we do not agree that the inherently 'high risk' nature of a dispatcher's interaction with the public is sufficient reason for imposing a special duty *per se* ").

We find the "danger" rationale for imposing a *per se* duty equally inapplicable in the hunting context. A hunter does not have a special duty to anticipate and control the illegal or negligent conduct of hunting companions solely because hunting is an inherently dangerous or "high risk" activity.

### 3.

### Statutory Duty

■ The Montgomerys urge us to hold that a special duty should be presumed because "hunting laws in Maryland ... require a heightened duty among hunters to protect ... private property owners." We do not agree that, by themselves or in combination, any of the statutory prohibitions against hunting without a license, hunting at night, or hunting on the property of others creates a private duty to control the conduct of other hunters. To be sure, these laws do require a

hunter to control *his or her own conduct,* by conforming it to the established legal parameters for hunting; but we see nothing in them to broadly require all hunters to ensure that their hunting companions do the same. *Cf. Williams,* 359 Md. at 127, 753 A.2d 41 ("the Legislature did not intend to create such a heightened level of protection in passing" statute requiring police officer to accompany domestic violence victim to family home in order to recover personal property).

## 4.

### Reliance

Finally, the Montgomerys argue that a special duty should be presumed because landowners and users rely on hunters to take affirmative measures to ensure their safety. We disagree, because there is no need for such a presumption of reliance. "[C]ase-by-case determinations of whether a particular [defendant] owed a special duty to a particular plaintiff fully address any 'reliance' concerns." *Fried,* 139 Md.App. at 255–56, 775 A.2d 430; *see also Muthukumarana,* 370 Md. at 495, 805 A.2d 372 ("We continue to believe that 'the intent of the 'special relationship' doctrine is better addressed by our general standard outlined in *Ashburn* ' because it preserves our ability to determine 'whether a special relationship exists' on a 'case-by-case basis' " that takes into account whether there was "specific reliance of the [plaintiff] on the [defendant]").

## II.

### Trespass

■ The Montgomerys argue that the circuit court erred in granting summary judgment on their trespass claim against Remsburg Sr. because he caused Remsburg Jr. to trespass on the Montgomery property. They rely on *Restatement (Second) of Torts* ("*Restatement* "), section 165 (1965), which states that

[o]ne who recklessly or negligently ... causes a ... third person so to enter is subject to liability to the possessor if ... the presence of the ... third person upon the land causes harm to the land, to the possessor, or to a thing or a third person[.]

We found no reported Maryland case applying or citing this section of the *Restatement.* We need not decide whether to follow the *Restatement* standard, however, because we conclude that, even if it is in accord with Maryland law,[13] the Montgomerys have not alleged a third party trespass within its purview.

We start our analysis with the critical fact that the Montgomerys sought damages only for the personal injuries that they sustained from Remsburg Jr.'s shooting. They did not seek any damages or allege any harm to their real property or to their use and enjoyment of their real property.

In this respect, the Montgomerys' trespass claim differs from the trespass claim in *Baker.* There, the hunt club was enjoined from allowing its huntsman, members, and dogs to trespass because their entry onto the Bakers' farm damaged crops, injured livestock, and interfered with experiments that Dr. Baker was conducting. *See Baker,* 171 Md. at 177, 188 A. 223. Here, in contrast to *Baker,* it was not Remsburg Jr.'s act of trespassing onto and over the Montgomery's land that caused their personal injuries. Rather, the only injuries for which the Montgomerys seek compensation were the ones caused by Remsburg Jr.'s negligent shooting after he arrived. Thus, it was Remsburg Jr.'s act of negligently shooting them, not his act of negligently trespassing, for which the Montgomerys sought to hold Remsburg Sr. liable.

In these circumstances, we conclude that this is not a third party trespass within the purview of *Restatement* section 165.

---

13. The circuit court correctly observed that there is no "law in Maryland that would support damages to body as a result of a trespass action," at least to the extent that there is no statute or case law explicitly permitting recovery of personal injury damages resulting from a trespass to land.

A comment to this section states that a trespass falls within this rule of liability "if, and only if, harm of the sort herein stated results." *Restatement* § 165 cmt. c. "The harm may be an impairment of the physical condition of the land or an invasion occurring on the land [or] some other legally protected interest of the possessor, connected with his interest of exclusive possession." *Id.* Such "interests include those in bodily security ... and the physical condition of the members of his family[.]" *Id.*

In this case, Remsburg Jr.'s trespass onto the Montgomery property harmed the Montgomerys in the respect that Remsburg Jr. invaded their land and that his presence there created a threat to their physical safety. But, as we have discussed, the Montgomerys are not seeking to redress either of these two types of harm in their trespass count. For this reason, we conclude that, even under the *Restatement* standard, summary judgment was appropriate on the Montgomerys' trespass claim.

Our conclusion is supported by the only illustration to section 165 addressing liability for "caus[ing] ... a third person" to trespass. That example describes the liability of a balloonist at a country fair who realizes that he will trespass onto private property to make his landing, and that spectators will follow to either rescue him or witness his descent. *See Restatement* § 165 cmt. c, illus. 6. In addition to the damage to a cow shed caused by the balloon, the balloonist also is liable for crops damaged by the spectators. *See id.* The *Restatement* balloonist's liability extends to the injuries sustained as an immediate and direct result of "the presence of the ... third person upon the land" causing harm to the landowner.

Here, as we have discussed, the Montgomerys assert that Remsburg Sr. "caused" Remsburg Jr. to trespass without alleging that it was "the presence of [Remsburg Jr.] ... upon the land [that] cause[d] harm ... to the[m.]" A review of the Montgomerys' pleadings on their trespass claim shows that the acts and omissions they contend warrant a trespass judg-

ment against Remsburg Sr. are the same ones upon which they premise their negligence claim against him. Thus, in contrast to the harm caused by the presence of the trespassing balloon spectators, the presence of Remsburg Jr. on the Montgomerys' property did not immediately and directly cause the personal injuries for which they seek compensation.

In the absence of any claim for "harm of the sort ... stated" in *Restatement* section 165, the Montgomerys' claim against Remsburg Sr. is one for negligence, not trespass. We therefore affirm the judgment in favor of Remsburg Sr. on the trespass claim.

**JUDGMENTS ON NEGLIGENCE AND LOSS OF CON-SORTIUM COUNTS VACATED; JUDGMENT ON TRES-PASS COUNT AFFIRMED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ½ BY APPELLANTS, ½ BY APPELLEE.**